PARATRANSIT INSURANCE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28342–91X.          Filed June 14, 1994.

*Sam Storey,* for petitioner.
*Ronald B. Weinstock,* for respondent.

OPINION

RAUM, *Judge*: The Commissioner determined that petitioner is not an organization described in section 501(c)(3)[1] and that it is not exempt from Federal income tax under section 501(a) for the taxable year 1988 and subsequent years. Petitioner has invoked the jurisdiction of this Court pursuant to section 7428 to obtain a declaratory judgment as to whether it meets the requirements of section 501(c)(3) and therefore qualifies for tax-exempt status under section 501(a). The case was submitted on the basis of a stipulated administrative record.

At the time of filing its petition, petitioner's principal place of business was in Oakland, California. It is a California nonprofit mutual benefit insurance corporation, organized in 1988.

During the 4-year period from 1983 to 1987, a 239-percent increase in automobile insurance caused serious disruptions and reductions in needed social service transportation provided by California transportation agencies. Because of this automobile insurance crisis, the California Department of Transportation (CALTRANS) applied for and received a technical studies grant from the U.S. Department of Transportation, Urban Mass Transportation Administration, to conduct a study of insurance alternatives for California social service transportation providers. The study report was issued in July 1987; it recommended that CALTRANS and the California Association for Coordinated Transportation assist private social service transportation providers to develop a mechanism for managing and limiting their liability risks and losses.

Pursuant to the recommendation of the study report, a steering committee made up of representatives of various private and public social service transportation providers was created to incorporate petitioner. Petitioner was incorporated on March 16, 1988.

To qualify for membership in petitioner, an organization must be a section 501(c)(3) tax-exempt private social service entity that uses automobiles to furnish transportation for the elderly, the handicapped, the needy, etc., and that uses such

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.

vehicles to provide other transportation services such as those familiarly known as "meals on wheels". Such organizations have been referred to as paratransit providers.[2] Petitioner's objectives and purposes were stated in its by-laws as follows:

The primary objectives and purposes of this Corporation shall be to create and administer a group self-insurance pool pursuant to section 5005.1 of the California Corporations Code.[3] Such pool is formed by private paratransit providers which are tax exempt under section 501(c)(3) of the Internal Revenue Code in order to provide the necessary financing for comprehensive automobile liability, risk management, and related services for pool members.[4]

In addition to providing funding and payment of member vehicular losses, petitioner also provides members with assistance and education on the control and management of losses arising from the operation of their vehicles.

Promptly after its incorporation on March 16, 1988, petitioner engaged in startup activities, enrolling eligible member organizations. It actually began its first year substantive operation as a nonprofit mutual benefit insurance corporation on July 1, 1988. It thus commenced the insurance business of risk spreading in July 1988 with a membership of 74 unrelated private, tax-exempt paratransit providers. Its membership increased to 142 by January 1991.

Upon becoming a member of the pool, a joining organization enters into a "member agreement" with petitioner committing the organization to the pool for 3 years. Under the terms of the membership agreement, each member pays a one-time $25 per vehicle registration fee, and thereafter pays premiums ("contributes funds")[5] to cover insured losses

---

[2] Although the word "paratransit" does not appear in various dictionaries examined by us, it is used by the parties and others to refer to organizations of the type described above.

[3] Sec. 5005.1 was added to the California Corporations Code in 1986. It allows corporations that are organized chiefly to provide health and human services and that are tax exempt under sec. 501(c)(3) to protect themselves against tort liability by joining together to form a group self-insurance pool.

[4] In an attachment to its application for tax exemption (Form 1023), petitioner characterized its primary purpose as follows:

The primary purpose of PIC [Paratransit Insurance Corp.] is to increase and improve the availability of paratransportation and other transportation related services to the elderly, handicapped and other needy in the State of California by providing members with a stable, affordable and equitable financing and management of liability risks and losses. * * *

[5] Petitioner at times uses the term "contributions" instead of "premiums", and at other times uses the term "premiums". Such purported contributions are more accurately referred to as pre-

for each year and to assist in covering the costs of risk management programs, driver safety programs, and other technical assistance provided by petitioner. The amount of a member's premiums ("contributions") is determined actuarially to take into account a number of factors, such as the deductibles selected by the member, the number of vehicles the member operates, the number of passengers carried by each vehicle, and the radius of the member's operations.[6] At the time of petitioner's application for exemption, each member paid an average of $800 a year per vehicle.

Petitioner has provided a series of estimates which suggests that, depending upon a member's locale, the premiums range from 20 to 50 percent less than the premiums charged by regular commercial insurance companies for comparable automobile insurance.[7] At other points in the record, however, petitioner has stated that in a random sampling of its member "contributions" (premiums) they were "30% to 80% below the commercial market"; and that "The estimates for 1991/92, * * * demonstrate a cost to members that range from 60% to 80% below the low estimate of commercial premiums." In comparing the cost of the insurance it provides its members with the cost of insurance from commercial vendors, petitioner increased the cost of insurance from commercial vendors by $5,000 for each member (regardless of the number of vehicles insured by such member) to reflect "an estimate of the cost to each member to individually * * * purchase * * * services" comparable to the risk management/safety services provided by petitioner.

The member agreement provides as follows with respect to the treatment of accumulated surplus contribution funds:

---

miums.

[6] Art. V of petitioner's "member agreement" states in pertinent part as follows:

Premiums shall be calculated by applying actuarially developed rates to the Member's vehicles. The rates shall be adjusted by exposure factors such as vehicle capacity, territory in which vehicle is garaged, and radius of operation. Premiums shall also be modified by loss experience when appropriate. The rating formula may be changed by the Board of Directors at the end of each Coverage Period.

[7] Petitioner estimates that commercial premiums in southern California were 40 to 50 percent higher than those charged to members; that, in the Bay area, commercial premiums were 30 to 35 percent higher; and that, in rural areas, commercial insurance premiums were 20 to 25 percent higher.

Article VII

*Return Premiums*:

Any surplus funds accumulated during a fiscal year in excess of the amounts necessary to fulfill all obligations for incurred claims, administrative and other program expenses, may be refunded by the Board as return Premiums or as reduced Premiums. For the purposes of determining such return or reduced Premiums the Board shall receive advice from a qualified casualty actuary. The actuary shall calculate the amount of incurred losses, which shall include paid and reserved claims, incurred-but-not-reported claims, loss development, loss trending, and a contingency reserve.

Return or reduced Premiums will only be available to Members that received coverage in the applicable fiscal year. The Board shall establish the distribution plan and dates for payment of return Premiums to the Members.

The self-insurance pool established by petitioner insures the first $100,000 of its members' claims. Coverage for claims in excess of that amount is obtained by purchasing reinsurance on the commercial market. Petitioner has described the arrangement as follows:

Paratransit assists in the administration of member organizations jointly self-funding losses up to a specified retention level through a single loss fund and by purchasing reinsurance from the commercial market for coverage above that level. Paratransit's pool level is for the first $100,000 in losses and excess policies and aggregate stop loss policies cover losses at limits of one million, two million and five million dollars. As well, members may select individual deductibles in amounts of $5,000 to $10,000 per occurrence. The vehicle physical damage coverage is purchased as a group from Lloyds London.

* * * Underwriting of excess coverage and claims services are provided by Curtis Day, Inc. and John Glenn Adjusters, respectively, both for-profit corporations. Curtis Day, Inc. bills and collects members contributions, pays the excess and stop-loss insurers, and turns over pool level funds to Paratransit. * * *

In a letter to the IRS dated July 19, 1991, petitioner provided a revised "Statement of Revenue and Expenditures"[8] for the short calendar year ending December 31, 1988, and the full calendar years 1989 and 1990. According to that letter, petitioner had the following sources of revenue:

---

[8] The "Statement of Revenue and Expenditures" contained in the July 19, 1991, letter revised the revenue and expense figures that appeared in petitioner's application for tax exemption.

| | 1988 | 1989 | 1990 |
|---|---|---|---|
| Application fees | $18,050 | $3,578 | $6,200 |
| Premiums-pooled layer | 310,015 | 926,749 | 1,206,557 |
| Interest income | 4,427 | 55,688 | 96,436 |
| Other | -0- | -0- | 5,137 |
| Grant income | [1] 60,000 | 30,000 | 399 |
| In-kind donations | [2] 221,742 | 196,819 | 167,175 |
| Total revenues | 614,234 | 1,212,834 | 1,481,904 |
| Total revenues excluding in-kind donations | 392,492 | 1,016,015 | 1,314,729 |

[1] The $60,000 grant income figure for 1988 included amounts for startup activities from Mar. 16, 1988, the date of petitioner's incorporation, to July 1, 1988, the date that it actually started the insurance business.

[2] There was no breakdown of the $221,742 in-kind donations to show how much was attributable to startup services prior to petitioner's beginning its business as an insurance company on July 1, 1988, or even prior to its actual incorporation on Mar. 16, 1988.

Amounts designated as "in-kind donations" represented the estimated value of time and services provided to petitioner by a number of individuals. Included in "in-kind donations" was the purported value of services of Katherine Adcock, who became petitioner's executive director, apparently upon its incorporation or shortly thereafter, as well as those of various other individuals at firms that provided services prior to petitioner's formation. Also included in "in-kind donations" was the purported value of time and services of petitioner's directors and members of various committees of petitioner. Petitioner's July 19, 1991, letter also listed its sources of expenditures for the years ended December 31, 1988 through 1990. The following is a condensed version of petitioner's schedule of revised expense figures:

| Administrative expenses | 1988 | 1989 | 1990 |
|---|---|---|---|
| Administrative expenses except in-kind | $103,451 | $178,909 | $199,188 |
| In-kind expenses[1] | 221,742 | 196,819 | 167,175 |
| Total administrative expenses | 325,193 | 375,728 | 366,363 |
| Total claims expenses | 217,725 | 788,653 | 1,078,066 |
| Total expenditures | 542,918 | 1,164,381 | 1,444,429 |

| Administrative expenses | 1988 | 1989 | 1990 |
|---|---|---|---|
| Total expenditures w/o in-kind expenses | 321,176 | 967,562 | 1,277,254 |
| Net operating income (loss) | 71,316 | 48,453 | 37,475 |

[1] As explained earlier, the item "in-kind donations" represents petitioner's estimate of the revenue value of time and services contributed by various individuals and organizations to petitioner. "In-kind expenses" apparently also reflects the value of such donated time and services for purposes of expense recognition. The amounts of "in-kind donations" and "in-kind expenses" are exactly equal.

In June 1990, petitioner applied for exemption from Federal income tax under section 501(c)(3) by submitting a Form 1023 [9] to the IRS district office for Los Angeles, California. The exemption application was referred to the IRS National Office for a ruling. After an initial adverse ruling, a final ruling by the IRS National Office was issued denying tax-exempt status to petitioner for the following stated reasons:

You are not operated exclusively for exempt purposes. You are operating for a substantial nonexempt, commercial purpose. Furthermore, because a substantial part of your activities consists of providing commercial-type insurance, you are disqualified from exemption by virtue of section 501(m) of the Code. Finally, because you provide services to unrelated exempt organizations, you are a "feeder" within the meaning of section 502 of the Code.

Petitioner thereafter sought review by this Court.[10] We sustain the Commissioner.

Organizations described in section 501(c)(3) are ordinarily exempt from Federal income tax pursuant to section 501(a). However, under section 501(m), such organizations qualify for exempt status under section 501(a) only if "no substantial part" of their activities consists of providing "commercial-type insurance." Sec. 501(m)(1). Section 501(m) reads in pertinent part as follows:

SEC. 501(m). CERTAIN ORGANIZATIONS PROVIDING COMMERCIAL-TYPE INSURANCE NOT EXEMPT FROM TAX.—

(1) DENIAL OF TAX EXEMPTION WHERE PROVIDING COMMERCIAL-TYPE INSURANCE IS SUBSTANTIAL PART OF ACTIVITIES.—An organization

---

[9] Form 1023 is described in its caption as an "Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code".

[10] The Commissioner has conceded on brief that petitioner exhausted its administrative remedies prior to filing its petition.

described in paragraph (3) or (4) of subsection (c) shall be exempt from tax under subsection (a) only if no substantial part of its activities consists of providing commercial-type insurance.

\* \* \* \* \* \* \*

(3) COMMERCIAL-TYPE INSURANCE.—For purposes of this subsection, the term "commercial-type insurance" shall not include—

(A) insurance provided at substantially below cost to a class of charitable recipients,

Section 501(m), as currently written, was added to the Code by section 1012(a) of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, 2390–2391.[11] The House Ways and Means Committee report strongly indicates that Congress intended a broad definition of the term "commercial-type insurance" when it added the current version of section 501(m).[12] See H. Rept. 99–426, at 662–665 (1985), 1986–3 C.B. (Vol. 2) 1, 662–665. Pertinent portions of the House report read as follows:

2. Taxation of Tax-Exempt Organizations Engaged in Insurance Activities (sec. 1012 of the bill and sec. 501(m) of the Code)

Present Law

\* \* \* \* \* \* \*

The providing of insurance benefits by an organization otherwise described in sec. 501(c)(3) generally is considered a commercial activity that does not meet the requirements for tax-exempt status. For example, *if two or more unrelated tax-exempt organizations pool funds for the purpose of accumulating and holding funds to be used to satisfy malpractice claims against the organizations, the organization holding the pooled funds is not entitled to tax exemption because the activity (i.e., the provision of insurance) is inherently commercial in nature.*

\* \* \* \* \* \* \*

Reasons for Change

The committee is concerned that exempt charitable and social welfare organizations that engage in insurance activities are engaged in an activity whose nature and scope is so inherently commercial that tax exempt

---

[11] The previous version of Code sec. 501(m) was wholly unrelated to the provisions enacted in 1986.

[12] The Senate bill did not contain any comparable provision, and the report of the conference committee followed the House bill with respect to "commercial-type insurance" with certain modifications that have no relevance here. See H. Conf. Rept. 99–841, at 346–350 (1986), 1986–3 C.B. (Vol. 4) 1, 346–350. In addition, the report of the Staff of the Joint Committee on Taxation contains language nearly identical to the House report, except for some minor modifications. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 583–586 (J. Comm. Print 1987).

status is inappropriate. The committee believes that *the tax-exempt status of organizations engaged in insurance activities provides an unfair competitive advantage to these organizations.* The committee further believes that the provision of insurance to the general public at a price sufficient to cover the costs of insurance generally constitutes an activity that is commercial.

\* \* \* \* \* \* \*

Explanation of Provision

Under the bill, an organization described in sections 501(c)(3) and (4) of the Code is exempt from tax only if no substantial part of its activities consists of providing commercial-type insurance. For this purpose, no substantial part has the meaning given to it under present law applicable to such organizations. See, e.g., *Haswell v. U.S.*, 500 F.2d 1133 (Ct. Cl. 1974); *Seasongood v. Comm'r,* \* \* \* [227] F.2d 907 (6th Cir. 1955); \* \* \*

\* \* \* \* \* \* \*

commercial-type insurance generally is any insurance of a type provided by commercial insurance companies. \* \* \*

[Fn. ref. omitted; citations omitted; emphasis added.]

Several aspects of the House report deserve comment. First, in the portion entitled "Present Law", the House report provides an example which describes petitioner's situation almost perfectly: two or more unrelated tax-exempt organizations pooling funds in a separate entity "to be used to satisfy malpractice claims against the organizations". And in that example, the House report unequivocally states that "the organization holding the pooled funds is not entitled to tax exemption because the activity (i.e., the provision of insurance) is inherently commercial in nature." Significantly, the House report refers generically to "insurance", and its reference to malpractice insurance was introduced by the phrase "For example". Certainly, there is no basis whatsoever to conclude that automobile liability insurance would not be regarded the same as malpractice insurance in this context.

In the portion entitled "Reasons for Change", the House report again refers in general terms to "insurance" activity, which it describes as "an activity whose nature and scope is so inherently commercial that tax exempt status is inappropriate." H. Rept. 99–426, *supra* at 664, 1986–3 C.B. (Vol. 2) at 664.

Also, the portion of the House report captioned "Explanation of Provision" states that "commercial-type insurance

generally is *any* insurance of a type provided by commercial insurance companies." H. Rept. 99–426, *supra* at 665, 1986–3 C.B. (Vol. 2) at 665 (emphasis added). It is clear from the passages in the report of the House Ways and Means Committee that the term "commercial-type insurance", as used in section 501(m), encompasses every type of insurance that can be purchased in the commercial market.[13]

Every relevant aspect of the administrative record indicates that petitioner provides "commercial-type insurance" within the meaning of section 501(m). First, the purpose of the insurance pool established by petitioner is to shift the risk of potential tort liability from each of the individual insured paratransit organizations to petitioner. Through its receipt of premiums from multiple member organizations, petitioner diversifies the risk of liability for each individual member. The fact that petitioner in addition peripherally provides education and other forms of assistance to help member organizations control and manage losses does not alter the fact it fundamentally provides a means for spreading their individual risks of tort liability. Furthermore, the *type* of insurance petitioner offers to its members is basic automobile liability insurance, a type of insurance provided by a number of commercial insurance carriers.

Finally, the *manner* in which petitioner insures its members clearly bespeaks a commercial nature. Petitioner does not offer insurance to members based on need, or even at a uniform charge. Instead it determines member contributions by reference to factors affecting the level of risk insured by petitioner, e.g., total number of vehicles, number of passengers per vehicle, radius of operation, etc. In short, petitioner calculates member premiums actuarially in precisely the same way that commercial insurers determine premiums for their customers. The commercial hue of such insurance fee arrangements has been noted by courts in cases decided under "pre-section 501(m)" law. See, e.g., *American Association of Christian Sch. Voluntary Emp. Beneficiary Association Welfare Plan Trust v. United States*, 663 F. Supp. 275, 277–278 (M.D. Ala. 1987), affd. 850 F.2d 1510, 1513–1514 (11th

---

[13] Such insurance, however, obviously does not include self-insurance by a single organization, which is not purchased commercially, and which does not involve risk sharing or risk shifting that is characteristic of true insurance. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 583–586 (J. Comm. Print 1987).

Cir. 1988); *Mutual Aid Association of the Church of the Brethren v. United States*, 759 F.2d 792, 795–796 (10th Cir. 1985). Moreover, it should also be noted that petitioner directly insures members only up to a $100,000 level of coverage. Coverage above $100,000 is effected through reinsurance obtained by petitioner in the commercial market.

Petitioner on brief argues that Congress, by using the phrase "commercial-type insurance" in section 501(m), intended to cover only those situations where insurance is offered to the general public. Petitioner relies on the following sentence in the House report:

The committee further believes that the provision of insurance to the general public at a price sufficient to cover the costs of insurance generally constitutes an activity that is commercial. [H. Rept. 99–426, *supra* at 664, 1986–3 C.B. (Vol. 2) at 664.]

This reference to the "general public" was deleted from the report of the Staff of the Joint Committee on Taxation in its General Explanation of the Tax Reform Act of 1986, at 504 (J. Comm. Print 1987). Furthermore, it must be remembered that section 501(m) was enacted to restrict rather than enlarge the categories of organizations that qualify for tax-exempt status under section 501(c)(3). And it is obvious from the example cited in the "Present Law" section of the House report that insurance pool arrangements—including those, which like petitioner, involve unrelated, tax-exempt organizations—were viewed as taxable activities even prior to enactment of section 501(m). The fact that the insurance provided by such pools was not available to the general public did not prevent them from having taxable status.

Moreover, if Congress had intended the phrase "commercial-type insurance" in section 501(m)(1) to apply only to insurance available to the general public, then it would not have needed to enact the exceptions in section 501(m)(3)(C) and (D)[14] to the definition of commercial-type insurance.

---

[14] Sec. 501(m)(3)(C) and (D) provides as follows:

(3) COMMERCIAL-TYPE INSURANCE.—For purposes of this subsection, the term "commercial-type insurance" shall not include—

\* \* \* \* \* \* \*

(C) property or casualty insurance provided (directly or through an organization described in section 414(e)(3)(B)(ii)) by a church or convention or association of churches for such church or convention or association of churches,

Both section 501(m)(3)(C) ("property or casualty insurance provided * * * by a church or convention * * * for such church or convention") and section 501(m)(3)(D) ("retirement or welfare benefits * * * [provided by] a church or a convention * * * for the employees * * * of such church or convention") describe insurance arrangements to which members of the general public clearly would not have access. Viewed against this backdrop of statutory provisions and legislative history, petitioner's argument is simply unpersuasive. Petitioner clearly provides "commercial-type insurance" as defined in section 501(m).

Even if, as we have concluded above, petitioner does provide "commercial-type insurance" within the meaning of section 501(m)(1), it is not disqualified from tax exemption under section 501(a) by reason of section 501(m) if the proscribed activity, i.e., provision of commercial-type insurance, is not a "substantial part" of petitioner's overall activities. Sec. 501(m)(1). The House report states that the phrase "no substantial part", for purposes of section 501(m), "has the meaning given to it under present law applicable to such organizations. See, e.g., *Haswell v. United States*, 500 F.2d 1133 (205 Ct. Cl. 1974); *Seasongood v. Commissioner*, 1227 [sic] F.2d 907 (6th Cir. 1955)". H. Rept. 99–426, *supra* at 664, 1986–3 C.B. (Vol. 2) at 664. The cases referred to in the House report defined substantiality in regard to an organization's legislative or political activities. However, as the House report makes clear, Congress obviously intended to rely on that existing body of law in defining the term "substantial" for purposes of the proscription in section 501(m)(1) on insurance activities. In *Seasongood v. Commissioner*, 227 F.2d 907, 912 (6th Cir. 1955), revg. 22 T.C. 671 (1954), the Court of Appeals concluded that where "less than 5% of the time and effort of * * * [an organization] was devoted to * * * activities * * * found to be 'political'", such political activities "were not in relation to all of its other activities *substantial*, within the meaning of the section." In *Haswell v. United States*, 205 Ct. Cl. 421, 443–444, 500 F.2d 1133 (1974), the

(D) providing retirement or welfare benefits (or both) by a church or a convention or association of churches (directly or through an organization described in section 414(e)(3)(A) or 414(e)(3)(B)(ii)) for the employees (including employees described in section 414(e)(3)(B)) of such church or convention or association of churches or the beneficiaries of such employees * * *

Court of Claims held that where an organization applied approximately 16 to 20 percent of its total expenditures toward political activities during the years 1967 and 1968, its political activities were "more than [an] insubstantial" part of its overall activities, and therefore the organization did not qualify for tax exemption under section 501(c)(3).

We recognize that neither *Seasongood* nor *Haswell* purported to fix an automatic percentage for substantiality. Nevertheless, even the most cursory examination of petitioner's operations reveals that its insurance-related expenditures far exceed the percentages involved in *Seasongood* and *Haswell*. For example, on the basis of the figures provided in petitioner's letter dated July 19, 1991, petitioner's "Total Claims Expenses" during the calendar years 1988, 1989, and 1990 were 40.11 percent, 67.74 percent, and 74.64 percent, respectively, of its total expenditures during each of those years.[15] Petitioner's insurance activities are unquestionably a substantial part of its operations within the meaning of section 501(m).

Petitioner nonetheless contends that it should not be denied tax exemption by reason of section 501(m), because it falls within the exception in section 501(m)(3)(A) applicable to "insurance provided at substantially below cost to a class of charitable recipients". Petitioner's contention is without merit.

Passing the question whether petitioner's tax-exempt members are the "class of charitable recipients" contemplated by the statute, it is clear that petitioner has in any event failed to insure them at "substantially below cost", within the meaning of section 501(m)(3)(A). In an attempt to clarify the meaning of this phrase, the House report states "See, e.g., Rev. Rul. 71–529, 1971–2 C.B. 234 (relating to the meaning of substantially below cost)." H. Rept. 99–426, *supra* at 665, 1986–3 C.B. (Vol. 2) at 665. Rev. Rul. 71–529, 1971–2 C.B. 234, involved an organization formed to aid tax-exempt educational institutions "by assisting them to manage more

---

[15] It is important to note that the above percentages reflect the inclusion in "total administrative expenses" of "in-kind expenses", i.e., expenses attributable to donated time and services. Thus, in calculating the percentages, we have made an assumption that is highly favorable to petitioner. If we were to exclude "in-kind expenses" in determining petitioner's total administrative costs, the percentages of total expenditures attributable to insurance claims would be even greater than those reflected above.

effectively their endowment or investment funds".[16] In the ruling, it was stated that

> Most of the operating expenses of the organization, including the costs of the services of the investment counselors and the custodian banks, are paid for by grants from independent charitable organizations. The member organizations pay only a nominal fee for the services performed. These fees represent less than fifteen percent of the total costs of operation. [*Id.*]

The ruling concluded that, by performing such functions for the tax-exempt institutions at "a charge that is substantially below cost," the organization was "performing a charitable activity within the meaning of section 501(c)(3) of the Code." *Id.*

Applying this standard to petitioner's operations, as described in its July 19, 1991, letter to the IRS, it is clear that petitioner comes nowhere near the mark. Revenues from member contributions, i.e., the sum of the amounts designated as "application fees" and "premiums-pooled layer", totaled $328,065, $930,327, and $1,212,757, respectively, for the years 1988, 1989, and 1990. Petitioner's total expenditures, including in-kind expenses (i.e., donated services), totaled $542,918, $1,164,381, and $1,444,429, respectively, during each of those years. Thus, even if we accept petitioner's questionable inclusion of its so-called in-kind expenses in its total expenditures,[17] its revenues from member contributions as a percentage of total expenditures are 60.43 percent, 79.90 percent, and 83.96 percent for the years 1988, 1989, and 1990, respectively. If in-kind expenses are subtracted,

---

[16] In the ruling, the organization's investment activities were more fully described as follows:

The organization receives capital from the participating exempt organizations, which capital is then placed in one or more common funds in the custody of various banks. These common funds are controlled and managed by the organization. The funds are invested upon the advice of independent investment counsel retained by the organization. [Rev. Rul. 71–529, 1971–2 C.B. 234.]

[17] The propriety of including petitioner's figures of "in-kind expenses" as part of cost is open to challenge for a number of reasons. *First*, sec. 501(m)(3)(A) speaks of "insurance provided at substantially below cost", and it is arguable that in this context Congress was referring to out-of-pocket costs incurred by the insurance company, costs that do not include donated services. *Second*, as to the year 1988, we have no way of knowing on the record before us what portion of the figure for in-kind services relates to services rendered prior to petitioner's incorporation. To the extent that such services were performed prior to Mar. 16, 1988, it would seem wholly improper to include their assumed value in the cost of insurance "sold" in 1988. Moreover, even to the extent that such services were rendered between the date of incorporation, Mar. 16, 1988, and July 1, 1988, the date that petitioner actually started the insurance business, the value of such services would seem at most to be allocable merely to startup costs, capital in nature, and not allocable to the cost of the insurance "sold" in 1988. Sec. 501(m)(3)(A).

then member contributions approach 100 percent of petitioner's total expenditures during each of those years.

Petitioner also contends that "in determining *substantially below costs* the test should be applied against its administrative operating costs only" rather than its total expenditures, "including * * * [costs relating to] members' pool claim payments or reserve accounts." (Pet. Opening Brief at 11.) However, nothing in the legislative history or elsewhere supports such a notion. Indeed, the ruling cited in the House report, Rev. Rul. 71–529, 1971–2 C.B. 234, in describing the percentage of organizational costs attributable to member fees, specifically refers to "the *total* costs of [the organization's] operation." (Emphasis added.) Moreover, petitioner's contention flies in the face of common sense. It would require that, in determining whether insurance was provided at a price substantially below cost, we exclude from the calculation the very costs that relate to the insurance itself.

Petitioner further argues that in determining what is substantially below cost, we should look to the percentages referred to in *Haswell v. United States, supra,* and other cases. But *Haswell* and the other cases have no relevance in this connection. The House report is quite clear on this point. *Haswell* is relevant only in determining the substantiality of an organization's commercial type insurance activities vis-a-vis its other activities. It is not the standard to be used in determining whether such insurance has been provided at substantially below cost. Petitioner does not qualify for the exception in section 501(m)(3)(A) for insurance provided at substantially below cost to a charitable class of recipients.

In view of the conclusion that we have reached in respect of section 501(m), we need not consider the Government's alternative positions that petitioner is disqualified for exemption either because it does not otherwise qualify as a section 501(c)(3) organization or because it is a feeder organization within the meaning of section 502.

*Decision will be entered for respondent.*