FLORIDA HOSPITAL TRUST FUND, ET AL.,[1] PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 2966–93X, 2967–93X, 2968–93X.     Filed August 4, 1994.

---

[1] Cases of the following petitioners are consolidated herewith: Florida Hospital Excess Trust Fund B, docket No. 2967–93X, and Florida Hospital Workers' Compensation Self-Insurance Fund, docket No. 2968–93X.

*Joseph J. Van Heyde II* and *W. Michael Clifford,* for petitioners.

*Charles B. Burnett,* for respondent.

OPINION

NIMS, *Judge:* Respondent determined that Florida Hospital Trust Fund, Florida Hospital Excess Trust Fund B, and Florida Hospital Workers' Compensation Self-Insurance Fund (petitioners) do not qualify as organizations described in section 501(c)(3), and thus are not exempt from Federal income taxation under section 501(a). (Unless otherwise indicated, all section references are to sections of the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.)

Petitioners invoked the jurisdiction of this Court, pursuant to section 7428(a), for a declaratory judgment that they are exempt from taxation as "cooperative hospital service organizations" under section 501(e). At the time the petitions were filed, each petitioner maintained its principal place of business in Maitland, Florida.

The statutory prerequisites for this declaratory judgment action have been satisfied. See sec. 7428(b); Rule 210(c). Specifically, petitioners exhausted their administrative remedies within the Internal Revenue Service, received final adverse determination letters mailed on November 12, 1992, and properly invoked the jurisdiction of this Court by petitions filed on February 11, 1993.

These consolidated cases were submitted to the Court for decision pursuant to Rule 122(a) based upon the pleadings and stipulated administrative records as defined in Rule 210(b)(10). For purposes of this proceeding, we accept the facts and representations contained in the administrative records as true and incorporate them herein by this reference. Rule 217(b)(1).

*Factual Background*

A. *Florida Hospital Trust Fund (Trust Fund)*

Trust Fund is a trust organized on April 4, 1975, to serve as a "Medical Malpractice Risk Management Trust Fund" as

defined in Fla. Stat. Ann. section 627.357 (West 1994).[2] Florida law allows for the establishment of such trusts in order to provide a vehicle for member hospitals to self-insure on a group basis against hospital professional liability including all patient injuries. Trust Fund provides centralized, cooperative insurance services to its member hospitals through the employment of actuaries, risk managers, underwriters, accountants, and other insurance consultants.

Trust Fund members, numbering approximately 23 hospitals, are qualified members of the Florida Hospital Association and are either government-run hospitals as described in section 501(e)(1)(B)(iii) or are organizations described in section 501(c)(3).

Trust Fund is governed by an agreement dated April 1, 1985, entitled "Florida Hospital Trust Fund Mutual Covenants—Claims Made" (Trust Fund agreement). The Trust Fund agreement sets forth the terms under which member hospitals agree to pool their resources to self-insure within certain limits against liability arising from the death or injury of a person (including patients) due to the rendering or failure to render specified professional services. In particular, insurance is provided on a claims-made basis with coverage per member up to $250,000 per claim with an annual aggregate limit of $1 million. In order to obtain such cov-

---

[2] Fla. Stat. Ann. sec. 627.357 (West 1994), provides in pertinent part:

627.357. Medical malpractice self-insurance

(2) A group or association of health care providers composed by any number of members, is authorized to self-insure against claims arising out of the rendering of, or failure to render, medical care or services, or against claims for injury or death to the insured's patients arising out of the insured's activities, upon obtaining approval from the department [Fla. Dept. of Ins.] and upon complying with the following conditions:

(a) Establishment of a Medical Malpractice Risk Management Trust Fund to provide coverage against professional medical malpractice liability.

(b) Employment of professional consultants for loss prevention and claims management coordination under a risk management program.

(3) The fund may insure hospital parent corporations, hospital subsidiary corporations, and committees against claims arising out of the rendering of, or failure to render, medical care or services.

(4) The fund is subject to regulation and investigation by the department. The fund is subject to rules of the department and to part X of chapter 626, relating to trade practices and frauds.

(5) The trust fund may purchase medical malpractice insurance, specific excess insurance, and aggregate excess insurance, up to determined limits, as necessary to provide the insurance coverages authorized by this section, consistent with market availability. The trust fund may purchase such risk management services as may be required, pay claims as may arise under any deductible provisions, and engage in prudent investment of trust funds and other activities reasonably relating to the payment of claims and to providing medical malpractice self-insurance, to the extent otherwise consistent with this section and law generally applicable to medical malpractice insurers.

erage, each member is required to assume joint and several liability with respect to the obligations of Trust Fund with a right of indemnity against the remaining members based on each member's pro rata share of the obligation. In practice, members pay annual premiums based upon an independent actuary's projection of Trust Fund's anticipated funding needs. Member premiums are later adjusted, resulting in either an additional assessment or a refund or credit, to reflect Trust Fund's actual loss experience.

The Trust Fund agreement states that Trust Fund will be managed by a service agent pursuant to specified powers and authority as set forth in the agreement. The Trust Fund agreement further provides for the selection of a board of trustees to exercise the rights of the members.

B. *Florida Hospital Excess Trust Fund B (Trust Fund B)*

Trust Fund B is a trust organized on April 1, 1985, to serve as a "Medical Malpractice Risk Management Trust Fund" as defined in Fla. Stat. Ann. section 627.357 (West 1994) (see *supra* note 2). Trust Fund B provides centralized, cooperative insurance services to its member hospitals through the employment of actuaries, risk managers, underwriters, accountants, and other insurance consultants.

Trust Fund B members, numbering approximately 26 hospitals, are qualified members of the Florida Hospital Association and are either government-run hospitals as described in section 501(e)(1)(B)(iii) or are organizations described in section 501(c)(3).

Trust Fund B is governed by an agreement dated April 1, 1985, entitled "Florida Hospital Excess Trust Fund B Mutual Covenants—Claims Made" (Trust Fund B agreement). The Trust Fund B agreement sets forth the terms under which member hospitals agree to pool their resources to self-insure within certain limits against liability arising from the death or injury of a person (including patients) due to the rendering or failure to render specified professional services. The insurance, so-called excess liability coverage, is provided on a claims-made basis with coverage per member up to $10 million per claim with an annual aggregate limit of $10 million (in excess of a minimum retention of $250,000 per claim and an annual aggregate retention of $1 million). In order to obtain such coverage, each member is required to assume

joint and several liability with respect to the obligations of Trust Fund B with a right of indemnity against the remaining members based on each member's pro rata share of the obligation. In practice, members pay annual premiums based upon an independent actuary's projection of Trust Fund B's anticipated funding needs. Member premiums are later adjusted, resulting in either an additional assessment or a refund or credit, to reflect Trust Fund B's actual loss experience.

The Trust Fund B agreement states that Trust Fund B will be managed by a service agent pursuant to specified powers and authority as set forth in the agreement. The agreement further provides for the selection of a board of trustees to exercise the rights of the members.

## C. *Florida Hospital Workers' Compensation Self-Insurance Fund (Workers' Compensation Fund)*

Workers' Compensation Fund is a trust organized on September 1, 1977, to serve as a "Group Self-Insurer's Fund" as described in Fla. Stat. Ann. section 440.57 (West 1991).[3] Florida law allows for the establishment of such trusts in order to provide a vehicle for member employers to self-insure on a group basis against workers' compensation claims. Such funds allow member employers to reduce their insurance costs by minimizing expenses relating to claims processing and related matters. Workers' Compensation Fund provides centralized, cooperative insurance services to its member hospitals through the employment of actuaries, risk managers, underwriters, accountants, and other insurance consultants.

Workers' Compensation Fund members, numbering approximately 31 hospitals, are qualified members of the Florida Hospital Association and are either government-run hospitals as described in section 501(e)(1)(B)(iii) or are organizations described in section 501(c)(3).

---

[3] Fla. Stat. Ann. sec. 440.57 (West 1991), provides in pertinent part:

440.57. Pooling liabilities

(1) The * * * [Division of Workers' Compensation of the Florida Department of Labor and Employment Security] shall adopt rules permitting two or more employers to enter into agreements to pool their liabilities under this chapter for the purpose of qualifying as a group self-insurer's fund, which shall be classified as a self-insurer, and each employer member of such approved group shall be known as a group self-insurer's fund member and shall be classified as a self-insurer as defined in this chapter. * * *

Workers' Compensation Fund is governed by an indemnity agreement dated October 1, 1985. The indemnity agreement sets forth the terms under which member hospitals agree to self-insure against liability arising under the Florida Workers' Compensation Act. In order to obtain such coverage, Workers' Compensation Fund members are required to assume joint and several liability with respect to any lawful awards entered against another member by the Division of Workers' Compensation of the Florida Department of Labor and Employment Security. In practice, members pay annual premiums based upon rates prepared by the National Council on Compensation Insurance as mandated by the Florida Department of Labor and Employment Security. Member premiums are later adjusted, resulting in either an additional assessment or a refund or credit, to reflect Workers' Compensation Fund's actual liability.

## Discussion

To qualify as an organization described in section 501(c)(3) that is exempt from Federal income taxation under section 501(a) an organization generally must demonstrate: (1) It is organized and operated exclusively for certain specified exempt purposes; (2) no part of its net earnings inures to the benefit of a private shareholder or individual; (3) no part of its activities constitutes intervention or participation in any political campaign on behalf of any candidate for public office; and (4) no substantial part of its activities consists of political or lobbying activities.[4] *American Campaign Academy v. Commissioner*, 92 T.C. 1053, 1062 (1989).

---

[4] Sec. 501 provides in pertinent part:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

  (a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

       *       *       *       *       *       *       *

  (c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

       *       *       *       *       *       *       *

    (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for * * * charitable * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in * * * any political campaign on be-

In the event respondent determines that an organization does not qualify for exempt status, the organization may (after exhausting its administrative remedies) seek judicial review of the matter. In this regard, section 7428(a) confers jurisdiction on this Court (among others) to make a declaration with respect to the initial qualification of an organization as an organization described in section 501(c)(3).[5] *Houston Lawyer Referral Serv. v. Commissioner,* 69 T.C. 570, 571 (1978).

It is well established that the scope of our inquiry is limited to the propriety of the reasons given by respondent for denying the organization's application for exempt status. *Aid to Artisans, Inc. v. Commissioner,* 71 T.C. 202, 208 (1978). Thus, in making our declaration, we do not engage in a de novo review of the administrative record. *American Campaign Academy v. Commissioner, supra* at 1063; *Church in Boston v. Commissioner,* 71 T.C. 102, 105–106 (1978); *Houston Lawyer Referral Serv. v. Commissioner, supra* at 573–574, 577. The burden of proof is on petitioners to overcome the grounds for denial of the exemption set forth in respondent's determination. Rule 217(c)(2)(A); *Christian Manner Intl. v. Commissioner,* 71 T.C. 661, 664–665 (1979); *Hancock Academy of Savannah, Inc. v. Commissioner,* 69 T.C. 488, 492 (1977).

The parties disagree as to whether petitioners are organized and operated exclusively for exempt purposes. Respondent's final adverse determination letters state in pertinent part:

This ruling is made for the following reason(s):

You are not a cooperative hospital service organization described in section 501(e) of the Code because you are not organized and operated *solely* to perform on a centralized basis one or more services described in section

---

half of (or in opposition to) any candidate for public office.

[5] Sec. 7428(a) provides in pertinent part:

SEC. 7428. DECLARATORY JUDGMENTS RELATING TO STATUS AND CLASSIFICATION OF ORGANIZATIONS UNDER SECTION 501(c)(3), ETC.

(a) CREATION OF REMEDY.—In a case of actual controversy involving—

(1) a determination by the Secretary—

(A) with respect to the initial qualification * * * of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) * * *,

* * * * * * *

upon the filing of an appropriate pleading, the United States Tax Court * * * may make a declaration with respect to such initial qualification * * *.

501(e)(1)(A) for two or more exempt hospitals. Further, a substantial part of your activities consists of providing commercial-type insurance. Consequently, section 501(m) precludes your exemption as an organization described in section 501(c)(3). You are not operated exclusively for exempt purposes within the meaning of section 501(c)(3) of the Code. You are operated for a substantial non-exempt commercial purpose. Furthermore, you are a feeder organization within the meaning of section 502.

Petitioners, focusing on the legislative history underlying the statutory provisions in question, contend that respondent erred with respect to each of the alternative determinations set forth above.

The proper disposition of this matter turns largely on the correct interpretation of what are fairly specific statutory provisions. We preface our analysis with a brief review of the historical development of those provisions.

The law governing the exempt status of cooperative hospital service organizations finds its origin in a 1950 amendment to section 101 of the Internal Revenue Code of 1939 targeting so-called feeder organizations. See Revenue Act of 1950, ch. 994, sec. 301(b), 64 Stat. 953. The feeder organizations provision, carried over intact as section 502, now provides in pertinent part:

(a) An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt from taxation under section 501 on the ground that all of its profits are payable to one or more organizations exempt from taxation under section 501.

The legislative history of the feeder organizations provision reveals that it was adopted in part to alleviate concerns that exempt organizations involved in commercial enterprises might enjoy an unfair competitive advantage over taxable businesses operating in the same industry. S. Rept. 2375, 81st Cong., 2d Sess. 28–29, 35 (1950), 1950–2 C.B. 483, 504–505, 509.

In 1952, the Treasury Department adopted sec. 29.101–3(b), Regs. 111, 1952–2 C.B. 103–104 (subsequently redesignated sec. 39.101–2(b), Regs. 118), for the purpose of implementing the new feeder organizations provision. This regulation, now appearing as section 1.502–1(b), Income Tax Regs., states in pertinent part:

(b) * * * If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of

the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the organization is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations. * * *

For a more detailed history and analysis of this regulation see *Associated Hosp. Servs., Inc. v. Commissioner,* 74 T.C. 213, 224–229 (1980), affd. per order (5th Cir., Mar. 25, 1981).

Section 1.502–1(b), Income Tax Regs., proved controversial, particularly as applied to organizations providing services to tax-exempt hospitals. For example, in Rev. Rul. 54–305, 1954–2 C.B. 127, the Commissioner denied tax exempt status to a corporation organized to serve as a purchasing agent for its member hospitals on the ground that the corporation was properly classified as a nonexempt feeder organization. However, in *Hospital Bureau of Standards & Supplies, Inc. v. United States,* 141 Ct. Cl. 91, 158 F. Supp. 560, 563 (1958), the court found a similarly situated corporation to be exempt from taxation.

Congress eliminated some of the controversy surrounding the exempt status of hospital service organizations with the enactment of section 501(e) in 1968. See Revenue and Expenditure Control Act of 1968, Pub. L. 90–364, sec. 109(a), 82 Stat. 269. Section 501(e), as originally codified, provided in pertinent part:

SEC. 501(e). COOPERATIVE HOSPITAL SERVICE ORGANIZATIONS.—For purposes of this title, an organization shall be treated as an organization organized and operated exclusively for charitable purposes, if—
(1) such organization is organized and operated solely—

(A) to perform, on a centralized basis, one or more of the following services which, if performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, *purchasing,* warehousing, billing and collection, food, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services; and

(B) to perform such services solely for two or more hospitals each of which is—

(i) an organization described in subsection (c)(3) which is exempt from taxation under subsection (a),

\* \* \* \* \* \* \*

(iii) owned and operated by the United States, a State, the District of Columbia, or a possession of the United States, or a political subdivision or an agency or instrumentality of any of the foregoing;

(2) such organization is organized and operated on a cooperative basis and allocates or pays, within 8½ months after the close of its taxable year, all net earnings to patrons on the basis of services performed for them;
\* \* \*

\* \* \* \* \* \* \*

For purposes of this title, any organization which, by reason of the preceding sentence, is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), shall be treated as a hospital and as an organization referred to in section 503(b)(5).

[Emphasis added.]

In sum, section 501(e) sets forth the standards that an organization must satisfy to qualify as a cooperative hospital service organization, including a statutory list of the services that such an organization may provide for its member hospitals. See *HCSC-Laundry v. United States,* 450 U.S. 1, 8 (1981). As discussed in more detail below, Congress amended section 501(e)(1)(A) in 1988 by adding the parenthetical phrase "(including the purchasing of insurance on a group basis)" immediately after the word "purchasing".

Despite the enactment of section 501(e), disputes continued to arise concerning the exempt status of various types of hospital cooperatives. In Rev. Rul. 69–160, 1969–1 C.B. 147, the Commissioner denied section 501(e) exempt status to a cooperative organization established to provide personnel training, data processing, purchasing, and laundry services for its member hospitals. Relying on H. Conf. Rept. 1533, 90th Cong., 2d Sess. 43 (1968), 1968–2 C.B. 801, 814, the

Commissioner concluded that section 501(e)(1)(A) sets forth an exclusive list of the services that a cooperative hospital service organization may provide and remain qualified for exempt status. The Commissioner denied the requested exemption because the organization was providing laundry services, a service not listed in subsection (e)(1)(A). Confronted with similar facts, we held that a cooperative organization established to provide laundry services for its member hospitals is a feeder organization under section 502. See *Associated Hosp. Servs., Inc. v. Commissioner, supra.*

Ultimately, the issue of the exempt status of cooperative laundries made its way to the Supreme Court. Specifically, in *HCSC-Laundry v. United States, supra* at 8, the Supreme Court held that a cooperative organization established to provide laundry services for its member hospitals does not qualify for exempt status on the ground that laundry services are not listed in section 501(e)(1)(A).

Putting section 501(e) and cooperative hospital service organizations aside for the moment, we turn our attention to section 501(m), a provision designed to restrict the exempt status of organizations (such as Blue Cross and Blue Shield) involved in commercial type insurance activities. See H. Rept. 99–426, at 662–665 (1986), 1986–3 C.B. (Vol. 2) 1, 662–665. Section 501(m), codified under the Tax Reform Act of 1986, Pub. L. 99–514, sec. 1012(a), 100 Stat. 2390, provides in pertinent part:

SEC. 501(m). CERTAIN ORGANIZATIONS PROVIDING COMMERCIAL-TYPE INSURANCE NOT EXEMPT FROM TAX.—

(1) DENIAL OF TAX EXEMPTION WHERE PROVIDING COMMERCIAL-TYPE INSURANCE IS SUBSTANTIAL PART OF ACTIVITIES.—An organization described in paragraph (3) or (4) of subsection (c) shall be exempt from tax under subsection (a) only if no substantial part of its activities consists of providing commercial-type insurance.

Section 501(m)(1) provides that an organization is not entitled to exempt status under section 501(a) if a substantial part of its activities consists of providing commercial type insurance. While section 501(m) does not contain an affirmative definition of "commercial-type insurance", subsection (m)(3) provides a list of five types of activities that are not considered to fall within the meaning of the term, none of which relates to the types of insurance involved in this case.

Recently, in *Paratransit Ins. Corp. v. Commissioner,* 102 T.C. 745 (1994), we sustained the Commissioner's determination denying tax exempt status to a California corporation organized for the purpose of providing automobile liability insurance to tax-exempt social service organizations. In particular, we agreed with the Commissioner that the corporation was providing "commercial-type insurance" within the meaning of section 501(m).

The final development bearing upon the issues raised in this case concerns, as noted above, a 1988 amendment to section 501(e) clarifying that a cooperative hospital service organization may purchase insurance. In particular, section 6202(a) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, 102 Stat. 3730, provided for an amendment to subsection (e)(1)(A) to add the parenthetical phrase "(including the purchasing of insurance on a group basis)" after the word "purchasing". There is little in the way of legislative history explaining the 1988 amendment to section 501(e). H. Conf. Rept. 100–1104, at 209 (1988), 1988–3 C.B. 473, 699, states in pertinent part:

2. Purchasing of insurance by tax-exempt hospital service organizations

### Present Law

Section 501(e) provides tax-exempt status for hospital service organizations operated solely to perform, on a centralized basis, one or more of the following enumerated services: purchasing, data processing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel services.

### House Bill

No provision.

### Senate Amendment

The provision clarifies that the purchasing activities that may be carried on by a tax-exempt hospital service organization include the acquisition, on a group basis, of insurance (such as malpractice and general liability insurance) for its hospital members. The provision applies to purchases made before, on, or after the date of enactment.

### Conference Agreement

The conference agreement follows the Senate amendment.

In sum, a tax-exempt hospital service organization may purchase insurance on a group basis for its member hospitals.

With the foregoing as background, we return to the central question of whether petitioners qualify for tax-exempt status. The parties focus on two issues: (1) Whether petitioners are engaged in "purchasing insurance on a group basis" as contemplated under section 501(e)(1)(A) and (2) whether petitioners' activities consist of "providing commercial-type insurance" within the meaning of section 501(m). Our task is to properly construe the disputed statutory provisions.

In cases requiring statutory construction, it is well established that the statute is to be construed so as to give effect to its plain and ordinary meaning unless to do so would produce absurd or futile results. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–544 (1940). Moreover, where a statute is clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein. *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984).

### 1. *Section 501(e)*

We begin with petitioners' contention that they qualify for exempt status under section 501(e)(1)(A) as cooperative hospital service organizations. Section 501(e)(1)(A) provides in pertinent part that a cooperative hospital service organization shall be treated as an organization organized and operated exclusively for charitable purposes if the organization performs one of the specific services listed therein. Petitioners rely on the portion of subsection (e)(1)(A) that provides that a cooperative hospital service organization may engage in "the purchasing of insurance on a group basis".

Notably, no issue has been raised as to whether petitioners' activities involve "insurance" as defined by the Supreme Court, this Court, and others. See *Helvering v. LeGierse,* 312 U.S. 531, 539 (1941) (holding that an insurance transaction must involve risk-shifting and risk-distribution); *AMERCO & Subs. v. Commissioner,* 96 T.C. 18, 38 (1991), affd. 979 F.2d 162 (9th Cir. 1992); *Harper Group & Subs. v. Commissioner,* 96 T.C. 45, 57 (1991), affd. 979 F.2d 1341 (9th Cir. 1992); *Sears, Roebuck & Co. v. Commissioner,* 96 T.C. 61, 96–97 (1991), supplemented by 96 T.C. 671, affd. in part, revd. in part 972 F.2d 858 (7th Cir. 1992). Under the circumstances,

we assume, without deciding, that the arrangements in question constitute insurance.

As a result, we are left to decide whether petitioners' activities amount to "purchasing" insurance. In addressing petitioners' argument on this point, we begin with the admonition that

Exemptions as well as deductions are matters of legislative grace, and a taxpayer seeking either must show that he comes squarely within the terms of the law conferring the benefit sought. [*Nelson v. Commissioner*, 30 T.C. 1151, 1154 (1958).]

The implications of the disputed phrase "purchasing of insurance on a group basis" is not further developed in section 501(e) or elsewhere in the Internal Revenue Code. Accordingly, we turn to the plain and ordinary meaning of the words used in the statute. *United States v. American Trucking Associations, Inc., supra*. From our perspective, the plain meaning of the phrase "purchasing of insurance on a group basis" denotes a commercial transaction in which a cooperative hospital service organization negotiates and executes the purchase of insurance for its membership as a group. In so reading the phrase, we find that the operative word is "purchasing". Unfortunately for petitioners, we cannot agree that their activities amount to purchasing insurance.

Petitioners are organized and operated as separate entities under Florida law to provide a means by which their respective member hospitals can join together as a group to insure against professional liability (malpractice) and workers' compensation claims. In particular, petitioners provide centralized, cooperative insurance services to their member hospitals through the employment of actuaries, risk managers, underwriters, accountants, and other insurance consultants. Far from purchasing insurance, petitioners have assumed the role of the insurer. In the absence of specific statutory language permitting a cooperative hospital service organization to provide insurance services in this manner, we are compelled to conclude that petitioners' activities preclude them from qualifying for exempt status under section 501(e)(1)(A). See *HCSC-Laundry v. United States*, 450 U.S. 1, 8 (1981).

Looking past the plain language of the statute, petitioners assert that the legislative history of the provision indicates

that Congress intended the phrase "purchasing of insurance on a group basis" to be broadly interpreted to permit cooperative hospital service organizations "to provide malpractice and general comprehensive insurance on a self-insurance basis." Petitioners further assert that Congress added the parenthetical phrase to subsection (e)(1)(A) in an effort to "override" the Commissioner's restrictive view of the provision as articulated in G.C.M. 39122 (Jan. 25, 1984) and G.C.M. 39764 (Oct. 13, 1988). We disagree.

As indicated, there is a paucity of legislative history on the provision. H. Conf. Rept. 100–1104 (1988), 1988–3 C.B. 473, 699, states in pertinent part:

### Senate Amendment

The provision clarifies that the purchasing activities that may be carried on by a tax-exempt hospital service organization include the acquisition, on a group basis, of insurance (such as malpractice and general liability insurance) for its hospital members. The provision applies to purchases made before, on, or after the date of enactment.

Although the preceding material supports petitioners' assertion that the phrase in question was added to "clarify" the law, there is no evidence to support petitioners' contention that Congress intended for the provision to be liberally or broadly construed. Given that section 501(e)(1)(A) was amended shortly after the enactment of section 501(m) (which limits the tax-exempt status of organizations *providing* commercial type insurance), a more plausible explanation is that Congress intended the amendment to serve as clarification that a cooperative hospital service organization may *purchase* insurance on behalf of its members without risking a violation of subsection (m). In any event, it cannot be said that the legislative history provides unequivocal evidence of legislative purpose sufficient to construe section 501(e)(1)(A) to override the plain meaning of the words used therein. *Huntsberry v. Commissioner*, 83 T.C. at 747–748.

Similarly, there is little support for petitioners' contention that Congress was attempting to express its disagreement with a particular general counsel memorandum. The legislative history does not contain a single citation of a general counsel memorandum. Moreover, petitioners' argument concerning G.C.M. 39122 is particularly suspect given that Congress cited that particular G.C.M. with approval when

section 501(m) was enacted in 1986, a mere 2 years before the amendment to section 501(e). See H. Rept. 99–426, at 663 n.2 (1986), 1986–3 C.B. (Vol. 2) 1, 663 n.2.

Contrary to petitioners' view, our interpretation of section 501(e)(1)(A) is in harmony with the policies underlying the provision. It will be remembered that section 502 (the feeder organizations provision) was born of congressional concern that exempt organizations involved in otherwise commercial enterprises might enjoy an unfair competitive advantage over taxable businesses operating in the same industry. S. Rept. 2375, 81st Cong., 2d Sess. 28–29, 35 (1950), 1950–2 C.B. 483, 504–505. (As discussed more fully below, similar concerns motivated Congress to enact section 501(m)). Giving due regard to these policy concerns, and viewing section 501(e) as the limited exception to section 502 that it is, see *HCSC-Laundry v. United States, supra,* we decline petitioners' invitation to enlarge upon the statutory language as written.

Petitioners contend that our interpretation of section 501(e)(1)(A) renders the provision meaningless and produces a discriminatory result. In particular, petitioners maintain that a cooperative hospital service organization relegated to purchasing group insurance from licensed insurance carriers will provide no real benefits to its members. Further, petitioners find it unfair that their efforts to self-insure on a group basis render them ineligible for exempt status while a larger hospital with the financial strength to self-insure in-house is permitted to do so without jeopardizing its exemption. See Rev. Rul. 78–41, 1978–1 C.B. 148.

We disagree with the proposition that our interpretation of section 501(e)(1)(A) renders the provision meaningless. A cooperative hospital service organization that purchases insurance for its members on a group basis provides a valuable service to its member hospitals. Undoubtedly, member hospitals will realize direct savings due to the reduced need for in-house personnel required to handle insurance-related matters. See, e.g., *Hospital Bureau of Standards & Supplies, Inc. v. United States,* 141 Ct. Cl. 91, 158 F. Supp. 560, 563 (1958). In addition, member hospitals will likely benefit in the form of lower insurance premiums as a result of the cooperative's ability to use its size to negotiate from a position of power.

We likewise reject petitioners' contention that fairness and policy considerations mandate a ruling in their favor. While some might empathize with petitioners, the law simply does not provide for tax-exempt status under the circumstances presented. If a remedy is to be had at all, it must be obtained through legislative change.

## 2. *Section 501(m)*

Respondent determined in the alternative that section 501(m) operates to deny petitioners exempt status under section 501(a). While our analysis under section 501(e)(1)(A) provides an independent basis for denying petitioners the declaration they seek, we agree with respondent that section 501(m) serves as equally sound authority for reaching the same result.

Section 501(m) provides that an organization described in section 501(c)(3) is not entitled to exempt status under section 501(a) if a substantial part of its activities consists of providing commercial type insurance. As previously mentioned, the parties do not dispute that petitioners' activities involve "insurance". The parties do disagree, however, whether petitioners are "providing" insurance, and if so, whether the insurance is properly characterized as "commercial-type" insurance.

In the first instance, petitioners maintain that section 501(m) does not apply because their respective members (rather than petitioners themselves) are providing the insurance in question. Petitioners argue in pertinent part that

The Petitioners provide actuarial, accounting, underwriting, claims payment and other similar services, and hold assets to fund the program, but ultimately, it is the member hospitals of the Petitioners that provide the insurance. The Tax Commissioner has admitted * * * that the Petitioners employ an independent actuary to calculate the needed resources to meet the obligations that the member hospitals collectively have agreed to assume, plus operational expenses. If the Petitioners' expected claims and expenses exceed the resources on hand, the Petitioners assess the member hospitals. If the resources prove excessive, the excess is returned or allocated to the member hospitals. These procedures are in place because the member hospitals, not the Petitioners, are providing the insurance.

Contrary to petitioners' position, it is evident that petitioners are providing the insurance in question. The record in this case amply demonstrates that petitioners are established

as separate entities under Florida law to provide a means by which their respective member hospitals can join together as a group to insure against professional liability (malpractice) and workers' compensation claims. Moreover, it is petitioners, rather than their members, that provide the services essential to the administration of the insurance programs. Specifically, petitioners provide actuarial, accounting, underwriting, claims payment, and similar services. Given petitioners' integral and central role in the insurance programs, it follows that petitioners, not their members, are providing the insurance in question. Indeed, to adopt petitioners' position would be tantamount to ignoring petitioners as entities separate and distinct from their several members. This we cannot do. Cf. *Moline Properties v. Commissioner,* 319 U.S. 436, 438–439 (1943).

Nor are we persuaded that petitioners' practice of adjusting member premiums to reflect actual (as opposed to projected) loss experience mandates a finding that petitioners' members are providing insurance. As we see it, this aspect of the insurance programs merely assures that petitioners operate on a "break-even" basis and serves as a means for petitioners to shift the risk of insurance losses from their individual members to the whole group. It is this characteristic, petitioners' ability to shift the risk of loss, that distinguishes petitioners (the insurers) from their members (the insured). *Paratransit Ins. Corp. v. Commissioner,* 102 T.C. 745, 754 (1994). Simply stated, we see no support in the record for the proposition that petitioners' members are providing insurance.

Petitioners argue in the alternative that the insurance in question is not "commercial-type" insurance within the meaning of section 501(m). Relying on a 1986 U.S. General Accounting Office report discussing the withdrawal of commercial insurance companies from the Florida market (a document which is not a part of the record in this case, nor have we been asked to take judicial notice of its existence), petitioners assert that it is nonsensical to conclude that they are providing commercial type insurance. Petitioners argue that

Congress was concerned that tax-exempt organizations that engaged in insurance activities would enjoy an unfair advantage vis-a-vis their for-profit competitors. * * *

The problem that Code Section 501(m) was intended to address simply did not include the situation in Florida. In fact, the Petitioners were formed out of necessity, because commercial carriers refused to write the types of coverage offered by the Petitioners.

The term "commercial-type" insurance is not defined in section 501(m), nor is it defined elsewhere in the Internal Revenue Code. While, as already noted, section 501(m)(3)(A) does set forth a list of several activities that Congress expressly excepted from the reach of the term "commercial-type" insurance, petitioners do not contend, nor could they, that their activities fall within any of the exceptions.

Under the circumstances, we turn to the plain meaning of the words used in the statute. In employing the term "commercial-type" insurance, we understand that Congress intended for section 501(m) to apply to those organizations providing any "type of insurance that can be purchased in the commercial market." *Paratransit Insurance Corp. v. Commissioner, supra* at 754. There is no dispute that hospital professional liability and workers' compensation insurance are normally offered by commercial insurers. Accordingly, we conclude that petitioners are providing commercial type insurance within the meaning of section 501(m).

We find explicit support for our conclusion that petitioners are providing "commercial-type" insurance as contemplated under section 501(m) in H. Rept. 99–426, at 663–665 (1986), 1986–3 C.B. (Vol. 2) 1, 663–665. The House report includes a discussion of the concerns leading to the enactment of section 501(m) as follows:

### Present Law

\*   \*   \*   \*   \*   \*   \*

The providing of insurance benefits by an organization otherwise described in sec. 501(c)(3) generally is considered a commercial activity that does not meet the requirements for tax-exempt status. *For example, if two or more unrelated tax-exempt organizations pool funds for the purpose of accumulating and holding funds to be used to satisfy malpractice claims against the organizations, the organization holding the pooled funds is not entitled to tax exemption because the activity (i.e., the provision of insurance) is inherently commercial in nature.*[2]

Nevertheless, at least one major organization, which provides life insurance and annuities to employees of tax-exempt educational institutions,

has been recognized as a charitable organization by the IRS. [Fn. ref. omitted.]

\* \* \* \* \* \* \*

Reasons for Change

The committee is concerned that exempt charitable and social welfare organizations that engage in insurance activities are engaged in an activity whose nature and scope is so inherently commercial that tax-exempt status is inappropriate. The committee believes that the tax-exempt status of organizations engaged in insurance activities provides an unfair competitive advantage to these organizations. The committee further believes that the provision of insurance to the general public at a price sufficient to cover the costs of insurance generally constitutes an activity that is commercial.

In addition, the availability of tax-exempt status under present law has allowed some large insurance entities to compete directly with commercial insurance companies. \* \* \* [Citing the rise of Blue Cross/Blue Shield organizations.]

\* \* \* \* \* \* \*

Explanation of Provision

Under the bill, an organization described in sections 501(c)(3) and (4) of the Code is exempt from tax only if no substantial part of its activities consists of providing commercial-type insurance. \* \* \*

In the case of such a tax-exempt organization, the activity of providing commercial-type insurance is treated as an unrelated trade or business (sec. 513) but, in lieu of the usual tax on unrelated trade or business taxable income, the unrelated trade or business activity is taxed under the rules relating to insurance companies (Subchapter L).

*For this purpose, commercial-type insurance generally is any insurance of a type provided by commercial insurance companies.* \* \* \*

[Emphasis added.]

---

[2] See, e.g., G.C.M. 39122, CC:EE–36–82 (Jan. 25, 1984); G.C.M. 39003, CC:EE–37–82 (June 24, 1983).

We note that H. Conf. Rept. 99–841, at II–346 (1986), 1986–3 C.B. (Vol. 4) 1, 346, generally follows the bill of the House Committee on Ways and Means with modifications that are not relevant to this discussion. Moreover, the specific concerns relating to unfair competition articulated in the report of the House Committee on Ways and Means are echoed in the Staff of the Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 583–586 (J. Comm. Print 1987).

Although concerns relating to the activities of Blue Cross and Blue Shield organizations may have precipitated the

codification of section 501(m), see Shill, "Revocation of Blue Cross & Blue Shield's Tax-Exempt Status an Unhealthy Change? An Analysis of the Effect of the Tax Reform Act of 1986 on the Taxation of Blue Cross & Blue Shield and Health Insurance Activities", 6 B.U.J. Tax Law 147, 147 n.2 (1988), the report of the House Committee on Ways and Means quoted above reflects Congress' view that organizations engaged in insurance pooling or group self-insurance arrangements (including malpractice insurance) are involved in inherently commercial activities. Congress resolved to deny exempt status to organizations engaged in such activities in order to ensure that such organizations would not enjoy an unfair competitive advantage over their commercial counterparts.

As we see it, petitioners' activities clearly fall within the literal and intended scope of section 501(m). In this regard, we reject petitioners' argument that the dearth of commercial insurers in the Florida market renders section 501(m) inapplicable in this case. In short, whether an organization seeking exempt status happens to be competing with a commercial insurer at any particular point in time simply begs the question whether granting exempt status will tend to provide the organization with an unfair competitive advantage over commercial insurers. Focusing on the latter issue, and Congress' obvious desire to provide a level playing field for commercial insurers, we hold that section 501(m) applies to deny petitioners exempt status.

In sum, we hold that petitioners do not qualify as organizations described in section 501(c)(3), and thus they are not exempt from Federal income taxation under section 501(a). In light of the foregoing, we see no need to address respondent's determination under section 502.

To reflect the foregoing,

*Decisions will be entered for respondent.*