**NONPROFITS' INSURANCE ALLIANCE OF CALIFORNIA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–325T.**

United States Court of Federal Claims.

Nov. 10, 1994.

**278**

Thomas D. Terry, Washington, DC, for plaintiff. Lawrence L. Hoenig and Keith R. Gercken, Pillsbury Madison & Sutro, San Francisco, CA, and Paul F. McQuade, Pillsbury Madison & Sutro, Washington, DC, of counsel.

W.C. Rapp, Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant. David Gustafson, Dept. of Justice, Washington, DC, of counsel.

## OPINION

MILLER, Judge.*

This case is before the court after argument on plaintiff's action for a declaratory judgment pursuant to 26 U.S.C. § 7428(a) (Supp. V 1993). The central question presented is whether plaintiff, an organization formed to administer a group self-insurance risk pool, qualifies for tax-exempt status under section 501(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(a) (1988) (the "I.R.C."). Section 501(a) indicates that organizations described in I.R.C. § 501(c)(3) shall be exempt from taxation. First to be decided is whether plaintiff's organization constitutes an "exempt organization" as that term is defined in I.R.C. § 501(c)(3). Assuming that plaintiff's organization satisfies this definition, the issue becomes whether plaintiff is precluded from qualifying as tax-exempt by operation of I.R.C. § 501(m)(1), which disallows exemption for the provision of commercial-type insurance, or whether plaintiff's exempt status is preserved under I.R.C. § 501(m)(3)(A) because it provides insurance "at substantially below cost."

### FACTS

On September 15, 1988, the Nonprofits' Insurance Alliance of California ("plaintiff"), a group self-insurance risk pool with a membership consisting entirely of nonprofit organizations, was incorporated under the California Corporations Code (the "California Code") as a "mutual benefit corporation." Section 5005.1 of the California Code, enacted in response to concerns of California nonprofit organizations regarding the price and

* Judge Miller was confirmed as Christine Cook Nettesheim.

availability of commercial insurance, authorizes the existence of such group self-insurance pools. According to the terms of section 5005.1, plaintiff's insurance pooling arrangement neither qualifies as insurance, nor is subject to regulation under the California Insurance Code. In addition, plaintiff qualifies as a tax exempt charitable organization for purposes of California state income and franchise tax law.[1]

In April 1990 plaintiff applied to the Internal Revenue Service (the "IRS") requesting exempt status under I.R.C. § 501(c)(15) as an insurer with premiums not exceeding the statutory threshold.[2] The IRS conferred the status on June 20, 1990. On August 7, 1991, after recognizing that its premiums exceeded the statutorily designated amount required for exemption under I.R.C. § 501(c)(15), plaintiff submitted an application, dated June 20, 1991, for recognition of exempt status under I.R.C. § 501(c)(3) as an insurer operated exclusively for exempt purposes. On June 15, 1992, the IRS issued a proposed ruling denying plaintiff's request for exemption. Plaintiff protested by letter dated July 10, 1992, and the IRS issued a final decision denying plaintiff's exemption application on February 24, 1993. The grounds cited to support the denial included:

> You are not operated exclusively for exempt purposes. You are operating for a substantial nonexempt, commercial purpose. Furthermore, because a substantial part of your activities consists of providing commercial-type insurance you are disqualified from exemption by virtue of section 501(m) of the Code. Finally, because you provide services to unrelated exempt organizations, you are a "feeder" within the meaning of section 502 of the Code.

On May 24, 1993, plaintiff filed suit in the United States Court of Federal Claims seeking a declaration pursuant to I.R.C. § 7428(a) that it qualifies as an exempt corporation under section 501(c)(3). Disposition of this action hinges on the following factual allegations set forth in the administrative record concerning the nature of plaintiff's corporation.

In support of its application for exempt status under I.R.C. § 501(c)(3), dated June 20, 1991, plaintiff described itself as an organization formed "to provide reasonably priced liability coverages to its [nonprofit] members at stable prices not available from commercial insurers." Plaintiff's formation took place in response to the results of a study conducted by the Liability Insurance Task Force, a group sponsored by the California Association of Nonprofits. The Task Force reported that California nonprofit organizations had encountered difficulties obtaining affordable insurance and had endured periods of large price increases, coverage reductions, and cancellations. Nonprofit organizations particularly are affected by price increases because their rigid budget structure and funding schedule disables them from swiftly adapting to market changes.

According to the Task Force study, the existence of an insurance risk-pool enables member organizations to pool their risks and resources so as to secure insurance at regular prices on a continual basis. Plaintiff maintains that by providing insurance at stable prices, it "directly advances the charitable purposes of nonprofit organizations because it substantially impacts the services that those organizations ... [can] provide." Plf's Br. filed Feb. 22, 1994, at 7. As plaintiff notes:

> While there was no concern regarding periods of a "soft" market (i.e., a market in which insurance coverage was readily available to nonprofit organizations at a reasonable cost), the advent of a "hard" market (i.e., a market in which insurance coverage was either unavailable to nonprofits entirely, or was available only at highly inflated costs) could and would make it much more difficult, or even im-

---

**1.** On July 31, 1991, plaintiff reorganized as a "nonprofit public benefit corporation" under the California Code to ensure continued qualification for state tax-exempt status.

**2.** I.R.C. § 501(c)(15)(A) defines exempt organizations for purposes of section 501(a) as "[i]nsur-

ance companies or associations other than life (including interinsurers and reciprocal underwriters) if the net written premiums (or, if greater, direct written premiums) for the taxable year do not exceed $350,000."

possible, for nonprofit corporations to continue their charitable missions....

*Id.* at 3–4.

Plaintiff provides four basic activities to its member organizations, which include "providing liability insurance," Plf's Br. filed Feb. 22, 1994, at 5, developing educational materials and making educational presentations, providing loss control and risk management services free of charge, and serving as a resource for insurance-related questions by operating a toll-free telephone line. As plaintiff admitted in its section 501(c)(3) application, "[c]ommercial insurers provide similar coverages, but at wildly fluctuating prices...." Nonetheless, plaintiff maintains that its corporation differs from other commercial insurance companies in that plaintiff provides insurance at substantially below cost to its members and further provides loss control and risk management services free of charge. Plaintiff also argues that it differs from a commercial insurance company because it shares claims and loss data with the community in an attempt to encourage commercial companies to adjust their rates favorably toward nonprofit organizations.

Plaintiff's membership consists entirely of nonprofit organizations that both qualify as tax-exempt organizations under I.R.C. § 501(c)(3) and operate to fund or provide health or human services. The materials submitted by plaintiff in support of its exemption application indicate a membership of approximately 487 unrelated nonprofits. The membership composition profile reveals that 31 percent of the organizations promote human service and community improvement; 25 percent serve mental health, developmental disabilities, and other health related issues; 12 percent promote shelter, jobs, and nutrition; 15 percent serve the interests of arts and education; and the remaining 17 percent are uncategorized in terms of a specific charitable focus.

An organization seeking membership in plaintiff's organization must complete a membership application to be approved by the Board of Directors. Membership remains contingent on whether the nonprofit organization makes timely payment of both its premium payments and one-time "contribution"

or membership fee. Failure to make the requisite payments results in termination of all membership benefits. The one-time non-refundable membership fee serves as a contribution to the operating surplus of the corporation and is approximately 10 percent of the member's commercial general liability premium. Once the payments are made, each member becomes an owner of the corporation. The benefits of ownership include the guarantee that any profits received by plaintiff will inure only to the benefit of the owners in the form of reduced future insurance premiums.

In terms of insurance coverage, plaintiff provides commercial general liability, automobile liability, employer's non-owned and hired automobile liability, and miscellaneous professional liability. Plaintiff determines the amount of a member's premium payment based on a variety of criteria set forth in the membership application form. Such factors include, but are not limited to, potential hazards, the type of services provided by the organization, the existence of a safety program, and past claims history. Annual member premiums ranged from $69.00 to $92,328.00 in 1990, and typical liability limits were an annual aggregate of between $1 and $2 million.

To complement the in-house underwriting, plaintiff contracts with other companies to provide reinsurance for any risks in excess of $50,000.00. Several of these companies require plaintiff to maintain a two-to-one ratio of net premiums to surplus. Plaintiff contends that the standard insurance industry financial guidelines also recommend that insurers maintain a similar ratio of premiums to surplus.

Plaintiff achieved the requisite surplus level, after receiving $1.3 million in loans from six foundations, including the Ford Foundation. Each foundation entered into a separate loan agreement with plaintiff concerning the terms and conditions of the loan. The Ford Foundation loan, which is representative of all the loan agreements, 1) was evidenced by a promissory note; 2) characterized the creditor as unsecured; 3) specified a 2 percent rate of interest; 4) included certain financial reporting requirements; 5) specified

terms of default; and 6) indicated a repayment schedule. The loan agreement, dated September 18, 1989, further stated that plaintiff must make payments on principal and interest from earned surplus and that such payments shall be made only when an Actuary "certif[ies] that [the] Borrower had Earned Surplus as of the ... [relevant payment date] in an amount which equaled or exceeded the amount of ... [the] payment." The agreement also indicated that in cases wherein the interest or principal payments exceed earned surplus, the borrower shall pay to the lender the amount of earned surplus accrued as of the specified payment date.[3] Finally, the loan agreement stipulated in section 3.3 that "th[e] Loan Agreement and the Note (the "Loan Documents") will constitute the legal, valid and binding obligations of the borrower...."

Plaintiff and defendant dispute the proper characterization of the foundation loans. Plaintiff emphasizes the charitable nature of the loans, claiming that the loans constitute a subsidy or "contribution[ ]" rather than "true debt." Plf's Br. filed June 1, 1994, at 15. Plaintiff also notes that the IRS characterized these loans as "program-related investments" for purposes of the tax consequences to the respective foundations. Plaintiff argues that "[i]mplicit in ... [this] ruling is ... [the IRS'] classification of the 'loans' as grants for purposes of IRC § 4945(h) and 4945(d)(4) (sic)...." Def's Reply to Plf's Response to Def's Prop. Findings of Fact No. 11, filed July 21, 1994 (citation omitted). In contrast, defendant emphasizes the strict terms of the loan agreements and argues that the financial arrangements between plaintiff and the foundations can be interpreted in no way other than as loan agreements.

Plaintiff also received grants from twelve foundations in the amount of $330,100.00 to cover plaintiff's initial operating costs. Other entities donated $31,055.00 in equipment and $60,536.00 toward risk management programs.

## DISCUSSION

### 1. Declaratory judgments under I.R.C. § 7428(a)

■ I.R.C. § 7428(a) authorizes the Court of Federal Claims to entertain an action for a declaratory judgment concerning an organization's initial qualification as an organization described in section 501(c)(3). In order to invoke section 7428(a), the party seeking the declaration must exhaust all administrative remedies and file its action within 90 days of the date of receiving the IRS' final adverse determination regarding its application for exempt status. 26 U.S.C. §§ 7428(b)(2), (b)(3). Plaintiff satisfied both of these jurisdictional prerequisites.

■ The scope of review, particularly in initial qualification cases, is limited to the materials contained in the administrative record. *Easter House v. United States*, 12 Cl. Ct. 476, 482 (1987) (citing cases), *aff'd*, 846 F.2d 78 (Fed.Cir.) (Table), *cert. denied*, 488 U.S. 907, 109 S.Ct. 257, 102 L.Ed.2d 246 (1988). Although in some circumstances the court may rely on evidence outside the record, this evidence can be considered only where the party has made a showing of good cause. Because plaintiff has made no such showing, review is confined to the record provided to the court.

■ The legislative history of section 7428 indicates that this court should follow Tax Court practices with respect to declaratory judgments. S.Rep. No. 938, 94th Cong., 2d Sess. 588 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 4012; *see Church of Visible Intelligence That Governs the Universe v. United States*, 4 Cl.Ct. 55, 60 (1983) (holding Congress contemplated that the Claims Court—now the Court of Federal Claims—would follow Tax Court practices in declaratory judgment cases). Specifically, Tax Court Rule of Practice and Procedure 217, addressing declaratory judgment actions, provides that the facts contained in the administrative record are deemed true. *Easter House*, 12 Cl.Ct. at 482; *Church of the Visible Intelligence*, 4 Cl.Ct. at 60. Rule 217

---

**3.** In a letter dated November 10, 1992, plaintiff's accountants maintain that payments are due to the foundations "only when an independent certified actuary certifies that to make such repayment would in no way jeopardize the financial stability of NIAC [or plaintiff]."

further assigns plaintiff the burden of proving that the IRS erred in making its final determination. *Id.* Therefore, plaintiff must establish that the IRS improperly denied section 501(c)(3) tax-exempt status and that the grounds supporting the denial as set forth in the IRS' final adverse determination letter dated February 24, 1993, are incorrect. *Easter House,* 12 Cl.Ct. at 482 (citations omitted).

### 2. *Tax-exempt status under I.R.C. § 501(c)(3)*

■■■ Income tax exemptions are matters of legislative grace which the courts have consistently strictly construed. *Trustees of the Graceland Cemetery Improvement Fund v. United States,* 206 Ct.Cl. 609, 623, 515 F.2d 763, 770 (1975) (citing cases); *Haswell v. United States,* 205 Ct.Cl. 421, 433, 500 F.2d 1133, 1140 (1974), *cert. denied,* 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975); *Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987), *aff'd,* 862 F.2d 321 (Fed.Cir.1988) (Table). Accordingly, the organization generating income must pay federal income taxes unless the organization falls squarely within the parameters of a listed exemption from taxation. *Mutual Aid Ass'n of Church of the Brethren v. United States,* 759 F.2d 792, 794 (10th Cir.1985) (citing *HCSC–Laundry v. United States,* 450 U.S. 1, 5, 101 S.Ct. 836, 838, 67 L.Ed.2d 1 (1981) (per curiam)). The exemption at issue in this case is conferred by I.R.C. § 501(c)(3).

■■■ According to I.R.C. § 501(a), an organization described in section 501(c)(3) qualifies for tax-exempt status.[4] Section 501(c)(3)

defines exempt organizations, in pertinent part, as

> Corporations, and any community chest, fund, or foundation, organized and *operated exclusively* for religious, charitable, scientific testing for public safety, literary or educational purposes, or to foster national or international amateur sports competition ... or for the prevention of cruelty to children or animals, no part of the net earnings of which inure to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda or otherwise attempting, to influence legislation....

(Emphasis added.) With respect to I.R.C. § 501(c)(3), the parties dispute only whether plaintiff operates exclusively for an exempt purpose.[5]

■■■ An organization operates exclusively for an exempt purpose when "it engages primarily in activities which accomplish one or more of ... [the] exempt purposes specified in section 501(c)(3)...." Treas.Reg. 1.501(c)(3)–1(c)(1), 26 C.F.R. § 1.501(c)(3)–1(c)(1) (1994). "[T]he presence of a single ... [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly ... [exempt] purposes...." *Better Business Bureau of Washington, D.C., Inc. v. United States,* 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945); *see also Church of the Visible Intelligence,* 4 Cl.Ct. at 61 (same); Treas.Reg. 1.501(c)(3)–1(c)(1) (stating that organization is not operated exclusively for exempt purpose "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose"). The issue of wheth-

---

4. Section 501(a), however, further provides that organizations satisfying the terms of either I.R.C. § 502 or § 503 shall be denied tax-exempt status. Section 502 denies exemption to entities qualifying as feeder organizations and section 503 denies exemption to organizations engaged in prohibited transactions.

5. The parties also dispute whether I.R.C. § 501(m), entitled "Certain organizations providing commercial-type insurance not exempt from tax," operates to preclude plaintiff from qualifying for tax-exempt status. In briefing their respective positions, the parties maintained that qualification under I.R.C. § 501(c)(3) was a prerequisite to applying section 501(m). In argu-

ment, however, the parties abandoned this position, noting that a finding that plaintiff satisfied the terms of I.R.C. § 501(m) obviates the need to examine plaintiff's status under section 501(c)(3). Although the court agrees with the latter position and acknowledges the redundant nature of the inquiry under I.R.C. §§ 501(c)(3) and (m), the court will address section 501(c)(3) first before examining section 501(m) because the statute so instructs. *See* I.R.C. § 501(m)(1) (stating that "[a]n organization *described in paragraph (3) ... of subsection (c)* shall be exempt from tax under subsection (a) only if no substantial part of its activities consists of providing commercial-type insurance." (Emphasis added.)

er an organization has a substantial nonexempt purpose is a question of fact to be resolved based on the evidence presented in the administrative record. *Living Faith, Inc. v. Commissioner,* 950 F.2d 365, 371 (7th Cir.1991) (citing, *inter alia, B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 357, 1978 WL 3344 (1978)). Facts concerning an organization's tax designation under state law bear little or no weight in the section 501(c)(3) analysis. *Easter House,* 12 Cl.Ct. at 482–83; G.C.M. 39,737 (May 24, 1988).

In a letter dated February 24, 1993, the IRS denied plaintiff's application for an exemption under section 501(c)(3) due to the finding that plaintiff was operated for "a substantial nonexempt, commercial purpose." Plaintiff disputes this characterization, maintaining that the fact an organization operates in a manner similar to a commercial entity is not dispositive of the section 501(c)(3) exemption analysis. Plaintiff further argues that the focus of the section 501(c)(3) inquiry must be on the purposes of the organization, not its activities.

It is defendant's position that an organization qualifies as having an exempt purpose " 'only if it engages primarily in activities which accomplish' that purpose." Def's Br. filed Apr. 25, 1994, at 11 (citing Treas.Reg. § 1.501(c)(3)–1(c)(1)). Defendant also contends that the critical inquiry centers on what the organization accomplishes and the manner in which it achieves its goals. According to defendant, the good-faith assertions on behalf of plaintiff's officers play no role in the section 501(c)(3) inquiry, especially in situations where the objective facts of the record describe a substantial nonexempt, commercial purpose.

■ As plaintiff properly notes, the critical inquiry under the operational test is on the "purposes towards which an organization's activities are directed ..., not [on] the nature of the activities themselves." *B.S.W. Group,* 70 T.C. at 356–57. Several courts, however, have indicated that the purposes of an organization may be inferred from the manner of its operations. *Living Faith,* 950 F.2d at 372 (citing cases); *see also Universal Life,* 13 Cl.Ct. at 583 (stating that an organization's activities are indicative of its pur-

poses); *Presbyterian & Reformed Pub. Co. v. Commissioner,* 743 F.2d 148, 155 (3d Cir. 1984) (stating that ends can be inferred from selected means).

■ Plaintiff is also correct that the sole fact that an organization constitutes a trade or business does not, in and of itself, bar the organization from exemption under section 501(c)(3), so long as the operation of the trade or business furthers the exempt purpose. *See* Treas.Reg. 1.501(c)(3)–1(e)(1). In evaluating an entity engaged in a commercial activity, a determination must be made regarding " 'whether the business activities of the taxpayer are incidental to its charitable objectives, or whether, in fact, the converse is true.' " *American Inst. for Economic Research v. United States,* 157 Ct.Cl. 548, 555, 302 F.2d 934, 937–38 (1962), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141 (1963) (quoting *Scripture Press Found. v. United States,* 152 Ct.Cl. 463, 471, 285 F.2d 800, 805 (1961), *cert. denied,* 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962)).

■ The courts have developed various factors to consider in determining whether an organization promotes a forbidden nonexempt purpose under section 501(c)(3). *American Inst. for Economic Research,* 157 Ct.Cl. at 556, 302 F.2d at 938; *B.S.W. Group,* 70 T.C. at 357. The manner in which an organization conducts its activities; the commercial hue or nature of those activities; the competitive nature of the activities; the existence of accumulated profits; and the provision of free or below cost services are factors that have been considered. *Living Faith,* 950 F.2d at 372 (citations omitted); *see also American Inst. for Economic Research,* 157 Ct.Cl. at 692, 302 F.2d at 938 (ruling that competition with commercial firms constitutes strong evidence of a substantial nonexempt purpose); *Peoples Translation Serv./Newsfront Int'l v. Commissioner,* 72 T.C. 43, 50, 1979 WL 3767 (1979) (noting that taxpayer's method of pricing services below cost is relevant to section 501(c)(3) inquiry); *B.S.W. Group,* 70 T.C. at 359 (stating that the fact an organization conducts a trade or "business with an apparently commercial character ... [as its] sole activity weighs

heavily against exemption"). These cases instruct that although none of these factors alone is dispositive of an organization's status under section 501(c)(3), the factors evaluated together can be determinative.

Plaintiff did not address any of these factors in its briefs. To support the position that it does not engage in a substantial non-exempt purpose, plaintiff instead relies on *Hospital Bureau of Standards and Supplies, Inc. v. United States,* 141 Ct.Cl. 91, 158 F.Supp. 560 (1958), and *Northern California Cent. Serv., Inc. v. United States,* 219 Ct.Cl. 60, 591 F.2d 620 (1979), which involved hospital cooperatives. These cases do not undertake an analysis of the aforementioned factors; instead, they examine the nature of the relationship between the services the taxpayer seeking exemption offers and its member organizations. In addition, plaintiff asserts that almost all of its activities "consist of assisting its member charitable organizations to secure affordable and stable insurance coverage, as well as provid[e] ... other insurance-related services." Plf's Br. filed Feb. 22, 1994, at 27. By providing such assistance, plaintiff contends that it "directly advances the charitable purposes of [its member] nonprofit organizations" and therefore cannot be held to advance a nonexempt purpose. *Id.* at 7. Prior to discussing the cases upon which plaintiff relies, the court addresses the traditional factors underlying the section 501(c)(3) inquiry.

Plaintiff exists solely for the purpose of selling insurance to nonprofit exempt organizations at the lowest possible cost on a continued, stable basis. Selling insurance undeniably is an inherently commercial activity ordinarily carried on by a commercial for-profit company. Plaintiff even admitted in its application for exempt status under section 501(c)(3), dated June 20, 1991, that "[c]ommercial insurers *provide similar coverages,* but at wildly fluctuating prices...." (Emphasis added.) Plaintiff attempts to temper this admission by noting that plaintiff differs from commercial insurance companies in that it provides insurance at substantially below cost and provides loss control and risk management services free of charge. Moreover, plaintiff maintains that, unlike commer-

cial insurance companies, it shares claims and loss data with the community in order to facilitate adjustment of commercial rates in a manner more favorable to nonprofit organizations.

Despite these differences the nature and operation of plaintiff's activities are commercial in nature. For example, plaintiff engages in the actual underwriting of insurance policies and contracts with other firms to secure reinsurance for claims in excess of $50,000.00, activities generally carried out by commercial for-profit entities. In addition, plaintiff's policies provide that the benefits of membership cease immediately when a member fails to make timely payment of either the contribution fee or premium payments. Thus, similar to a commercial insurance company, benefits cease with a corresponding failure to pay premiums. *See Federation Pharmacy Serv., Inc. v. Commissioner,* 72 T.C. 687, 692, 1979 WL 3712 (1979), *aff'd,* 625 F.2d 804 (8th Cir.1980) (noting that membership benefits terminate with failure to pay, making organization no more charitable than commercial cooperative).

Finally, as defendant aptly notes, plaintiff shares many of the characteristics of a commercial mutual insurance company. Mutual insurance companies generally are exempt from taxation under I.R.C. § 501(c)(15), provided that their annual premiums do not exceed $350,000.00. Mutual insurance companies which, like plaintiff, fail to qualify under section 501(c)(15) ordinarily seek exemption under I.R.C. § 501(c)(3) or § 501(c)(4). *American Ass'n of Christian Sch. Voluntary Employees Beneficiary Assoc. Welfare Trust Plan v. United States,* 850 F.2d 1510 (11th Cir.1988); *Mutual Aid,* 759 F.2d 792; *Bethel Conservative Mennonite Church v. Commissioner,* 746 F.2d 388 (7th Cir.1984).

*Mutual Aid* involved an organization formed to provide insurance to members of the Church of Brethren. The organization's income derived primarily from insurance premiums, a one-time membership contribution, and funds earned from the investment of insurance premiums. The court held that although plaintiff's purpose is religiously based, plaintiff operated as a mutual insur-

ance company, primarily providing property insurance—"an admitted commercial activity." *Mutual Aid,* 759 F.2d at 796.

In characterizing plaintiff as a mutual insurance company, the court focused on the fact that the taxpayer engaged in underwriting practices similar to those conducted in the commercial sector, required premium payments, and paid claims only after receiving the relevant documentation. Finally, the court noted that the taxpayer treated surplus and profit similar to any other mutual insurance company, in that " '[t]he ultimate considerations of . . . [Mutual Aid] in creating and using its surplus and profit are to provide a reasonable and adequate security margin, and to provide better protection and service to its members. . . .' " *Id.* (citation omitted). Thus, in *Mutual Aid* the similarities between the taxpayer and a mutual insurance company directed the court to find that the taxpayer did not qualify as exempt under section 501(c)(4). *See American Ass'n,* 850 F.2d at 1514 (holding plaintiff not exempt under I.R.C. § 501(c)(3) because it operated like a mutual insurance company, collecting premiums and engaging in underwriting practices consistent with those of the industry); *Paratransit Ins. Corp. v. Commissioner,* No. 28342–91X, 102 T.C. 745, slip op. at 15, 1994 WL 259241 (June 14, 1994) (noting commercial hue of group self-insurance risk pools).

Taxpayers in both *Mutual Aid* and *American Ass'n* analogized their cases to *Bethel,* wherein the court found a company organized to provide insurance exempt under I.R.C. § 501(c)(3). Both these courts, however, distinguished *Bethel* as a case involving only voluntary donations and no premiums. *See American Ass'n,* 850 F.2d at 1514 (distinguishing *Bethel* as a case wherein "members' contributions . . . were not tied to the market value of the insurance benefits received"). "[T]he insurance plan in *Bethel* operated like a church funded by voluntary offerings, [as opposed to] the plan in *Mutual Aid* [which] operated as a mutual insurance company." *Id.*

Plaintiff, like the insurers in *Mutual Aid* and *American Ass'n,* charges premiums based on the coverages requested and the apparent risks as evidenced from each member's application. The premiums ranged in value from $69.00 to $92,328.00 in 1990, depending on the attendant risks, such as lack of a safety plan or past claims history. Plaintiff also charges a one-time membership fee, as did the insurer in *Mutual Aid.* Although plaintiff has received donations to assist in the initial operating costs of the organization, unlike the insurer in *Bethel,* it has not received donations sufficient to distinguish it from a commercial mutual insurance company.[6] In *Bethel* the insurer charged no premiums or membership fees and, instead, took voluntary contributions at church each Sunday. Coverage was provided to church members regardless of whether they contributed. In contrast, plaintiff charges premiums of up to $92,328.00 per year dependant upon the amount of risk involved and the type of coverage sought. Membership benefits cease in plaintiff's organization immediately when a member fails to pay the requisite membership fee or premiums, a scenario not contemplated by the arrangement deemed exempt in *Bethel.*

Plaintiff also resembles a commercial mutual insurance company in that all profits retained by the corporation inure to the benefit of the members in the form of reduced future insurance premiums. Although plaintiff may not possess every attribute characteristic of a mutual insurance company, it possesses a majority of the qualifying characteristics, which only further enhances the determination that plaintiff is presumptively commercial in nature. Whenever an organization conducts a trade or "business with an apparently commercial character . . . [as its] sole activity, . . . that fact weighs heavily against exemption." *B.S.W. Group,* 70 T.C. at 359. Even accepting plaintiff's good-faith assertions of charitable intent and exempt purposes, plaintiff cannot deny the commercial hue of its operations. *See Scripture Press Found.,* 152 Ct.Cl. at 469–70, 285 F.2d

---

**6.** Plaintiff received grants in the amount of $330,100.00 to cover initial operating costs. Other donations included $31,055.00 in equip-ment and $60,536.00 for risk management programs. Plaintiff also received $1.3 million in "loans" from six foundations.

at 804 (ruling that taxpayer's activities, not the intensity of its religious convictions, control exemption); *Universal Life*, 13 Cl.Ct. at 584 (same).

Although the commercial nature of plaintiff's activities bears on the I.R.C. § 501(c)(3) analysis, it alone is not dispositive. The competitive nature of the activities is also pertinent. In fact "[c]ompetition with commercial firms is strong evidence of the predominance of nonexempt commercial purposes...." *B.S.W. Group*, 70 T.C. at 358. *American Institute for Economic Research*, which involved a trust that published an investment bulletin, addressed the issue of competition with commercial entities. Members of the trust paid for subscriptions to the bulletin. Plaintiff characterized these payments as voluntary charitable contributions, but the court disagreed, noting that "subscribers receive full value in exchange for their money...." 157 Ct.Cl. at 556, 302 F.2d at 938. The court further noted that to obtain a "contribution," plaintiff had to proffer something of value in return. In holding that plaintiff failed to qualify under section 501(c)(3), the court stated that "th[e] necessity or purpose to provide such information and service as would be desired by the public places plaintiff in competition with other commercial organizations providing similar services...." *Id.* Plaintiff also provides a service, insurance coverage, desired by the public, and by charging premiums and a one time "contribution fee," plaintiff places itself in competition with other commercial insurance firms.

Plaintiff admitted in its section 501(c)(3) application that it "provides[s] similar coverages" to that of a commercial entity. In describing its services, plaintiff explains that its existence stems from the cyclical, unstable commercial insurance markets. According to plaintiff, the cycle spans between periods of low insurance availability and high prices, *i.e.*, a hard market, and periods where insurance coverage is "readily available" at "reasonable cost," *i.e.*, a soft market. Plf's Br. filed Feb. 22, 1994, at 4. Although plaintiff

maintains that it was created in response to a particularly devastating hard market, plaintiff conceded in a letter dated January 23, 1992, to the IRS, that it "was created in what is becoming the longest soft market in history." In that same letter, plaintiff further conceded that "[d]uring the present 'soft market,' *when insurance carriers are very competitive*, ... carriers [often] pric[e] the larger nonprofits at 50 percent of the pricing recommended by the Insurance Services Office," a statistical organization that gathers claims data and publishes advisory premiums." (Emphasis added.) Notwithstanding plaintiff's contention that it saves its members at least 25 percent over commercial prices during the soft period of the cycle, plaintiff cannot deny that it competes with other commercial insurers during that period—a period which has existed since plaintiff's inception.

Plaintiff further notes in the January 23, 1992 letter that "[r]egardless of whether ... [it] is saving nonprofits 25 percent or 100 percent [in insurance costs] today, the real benefit ... will be recognized over time...." Plaintiff may be correct, but this court must analyze the record before it. Plaintiff admits that the insurance industry is facing one of the longest soft periods in the history of the industry, a period where plaintiff concedes insurance is "readily available" at "reasonable cost" from commercial insurers.

Another factor to consider in evaluating whether plaintiff advances a substantial nonexempt purpose is the existence and amount of accumulated profits. Plaintiff argues that any profits inure only to the benefit of member organizations in the form of reduced future insurance premiums. Again, this benefit is identical to the benefit that a member of a mutual insurance company receives. *Mutual Aid*, 759 F.2d at 796. A final factor to consider is whether plaintiff provides services below cost. This factor, like the other factors, is not alone dispositive of plaintiff's status under section 501(c)(3).[7] Although

---

7. An implicit circularity is present with respect to the "substantially below cost" analysis required by I.R.C. § 501(m)(3)(A) and the "below cost" analysis necessitated by I.R.C. § 501(c)(3). *See* Rev.Rul. 71–529, 1971–2 C.B. 234 (ruling that organization qualified as exempt under section 501(c)(3) because it provided services substantially below cost). This circularity forms the basis of the court's concern regarding the statutory language in I.R.C. § 501(m), which appears

plaintiff provides its services below cost and has received some voluntary contributions and loans from foundations, the court, finds that plaintiff did not provide such services substantially below cost. *See infra* pp. 289–93. Weighing the above factors, the court concludes that the IRS correctly determined that plaintiff has a substantial nonexempt commercial purpose.[8]

To support its exempt status under section 501(c)(3), plaintiff relies solely on *Hospital Bureau*, 141 Ct.Cl. 91, 158 F.Supp. 560, and *Northern California*, 219 Ct.Cl. 60, 591 F.2d 620, both of which involved hospital cooperatives. Instead of emphasizing the above factors, these cases analyzed the relationship between the services the taxpayer offered and the exempt member organizations. *Hospital Bureau* involved a corporation formed to test and purchase hospital supplies for member exempt hospitals. In holding the corporation exempt under section 101(6), the predecessor of I.R.C. § 501(c)(3), the court stated that "the technical analysis and purchase of hospital supplies from suppliers are *necessary and indispensable* to the operations of the ... [taxpayer's] member hospitals...." *Hospital Bureau*, 91 Ct.Cl. at 94, 158 F.Supp. 560 (emphasis added). The court further focused on the "close and intimate relationship" between the functioning of the member hospitals and the operations of the taxpayer's corporation; such relationship stemmed from the necessary and indispensable function the taxpayer served. *Id.*

*Northern California* involved an organization created to provide shared laundry services to non-profit hospitals. Holding the cooperative exempt under I.R.C. § 501(c)(3), the court emphasized that the "[l]aundry services ... [were] essential to the operation of a hospital...." *Northern California*, 219 Ct.Cl. at 68, 591 F.2d 620. The court characterized the services in this manner after taking judicial notice of the fact that "[i]f not perfectly performed, ... [laundry] may be the means of spreading the diseases that hospitals exist to contain or cure...." *Id.* at 67, 591 F.2d 620. The Supreme Court in *HCSC–Laundry*, 450 U.S. at 8, 101 S.Ct. at 839, disagreed with the Court of Claims' conclusion in *Northern California*, finding that I.R.C. § 501(e), solely controlled whether a hospital service cooperative qualified for exemption. The Court held that because the term "laundry service" was omitted from paragraph (e), these cooperatives were not exempt from federal income tax under I.R.C. § 501(a).

At argument defendant requested that this court not apply the analysis employed in *Hospital Bureau* and *Northern California*, because the cases dealt with hospital cooperatives, entities which Congress addressed through the enactment of I.R.C. § 501(e). Defendant, however, seemingly ignores that the "necessary and indispensable" analysis of the hospital cooperative cases has been applied in other contexts. *See e.g., Council for Bibliographic and Information Technologies v. Commissioner*, 63 T.C.M. (CCH) 3186, 1992 WL 145276 (1992) (addressing a library cooperative). Defendant further maintained that an examination of the cases is unneces-

---

to direct analysis under section 501(c)(3) prior to section 501(m). *See* I.R.C. § 501(m) (stating that "[a]n organization *described in paragraph (3)* ... *of subsection (c)* shall be exempt ... only if...." Because the court addresses the issue of providing services below cost with respect to plaintiff's section 501(m)(3)(A) argument, see *infra* pp. 289–93, it is unnecessary to repeat this analysis.

**8.** The report prepared by the Joint Committee on Taxation addressing section 501(m) further supports this conclusion. Staff of Jnt. Comm. on Taxation, 99th Cong., 1st Sess., *General Explanation of the Tax Reform Act of 1986* (Jnt.Comm. Print 1987). Under the heading "Prior Law," the report defined a situation analogous to plaintiff's wherein an organization would be denied tax-exempt status. The report specifically stated

that "if two or more unrelated tax-exempt organizations pooled funds for the purpose of accumulating and holding funds to be used to satisfy malpractice claims against the organizations, the organization holding the pooled funds was not entitled to tax exemption because the activity (i.e., the provision of insurance) was inherently commercial in nature." *Id.* at 583 (footnote omitted). Although the report refers to the provision of malpractice insurance, the report introduced the discussion of the pooling arrangement by the words "for example." Thus, the provision of automobile or general commercial liability insurance does not change the analysis. *Florida Hospital Trust Fund*, No. 2966–68–93X, 103 T.C. 140, 1994 WL 400439 (Aug. 4, 1994); *Paratransit Ins. Co. v. Commissioner*, No. 28342–91X, 102 T.C. 745, 1994 WL 259241 (June 14, 1994).

sary given that plaintiff's exempt status is precluded by operation of I.R.C. § 501(m)(1). Although the court agrees that I.R.C. § 501(m)(1) prevents exemption, the court proceeds with a discussion of plaintiff's authority because the statute indicates that section 501(m) comes into play only for those entities "described in" section 501(c)(3). *See supra* note 5.

It remains a question of fact as to whether a taxpayer's activities qualify as "necessary and indispensable" to the operations of its tax-exempt member organizations. *Council for Bibliographic*, 63 T.C.M. (CCH) at 3187–3. The Tax Court addressed the issue of necessary and indispensable with respect to a nonprofit corporation the members of which consisted solely of public and academic libraries. The corporation provided its members access to a regional library computer network, thereby enabling the library to catalogue information and control circulation materials. The court found the taxpayer's activities, like the activities of the corporation in *Hospital Bureau*, "necessary and indispensable to the operations of ... [its] members." *Id.* The court reasoned that the activities associated with cataloguing "are the essence of running a library." *Id.; see also Northern California*, 219 Ct.Cl. at 67, 71, 591 F.2d 620 (noting that taxpayer's laundry services are "crucial services" to its member organizations and "[i]f not perfectly performed, ... may be the means of spreading the diseases that hospitals exist to contain or cure"). Thus, the taxpayer provided an activity that constituted "an integral part of the member [libraries] ... activities." *Council for Bibliographic*, 63 T.C.M. (CCH) at 3187–3.

The focus in these cases centers on whether the organization applying for exemption provides services both that are integral to the daily functioning of the member organizations and that advance the reason for which the member organizations qualify as exempt corporations. As the Tax Court in *Council for Bibliographic* remarked, "[i]f petitioner's activities were not performed, each member library would be less able to accomplish its exempt purpose...." *Id.* Plaintiff argues that the potential onset of a hard insurance market may cause nonprofit organizations to lose insurance coverages and thereby restrict the realm of charitable activities in which they participate. Consequently, plaintiff argues that it performs a function integral to each of its member organizations.

Plaintiff fails to recognize an important distinction between the nature of its activities and the composition of its members and the nature of activities and composition of the members in *Hospital Bureau, Northern California*, and *Council for Bibliographic*. In these cases the activities performed were closely related to the daily functioning of the member organizations and all members were related. Undeniably, hospitals could not function without the services of testing and purchasing supplies or laundry; libraries could not function without an effective catalogue system. These activities enable the member organizations to perform their exempt functions. *See Council for Bibliographic*, 63 T.C.M. (CCH) at 3187–3 (stating that cataloguing activities "are the essence of running a library"); *Trustees of Graceland Cemetery*, 206 Ct.Cl. at 624, 515 F.2d at 771 (noting that "where one organization serves as a mere adjunct for a primary organization by providing services which are essential to the functioning of the primary organization and *which would be normally performed by it*, the adjunct will acquire the tax status of the primary company") (emphasis added). In contrast, providing insurance to 487 unrelated exempt organizations is not an activity that is vital to each member's exempt purpose. Such a service neither goes to the essence of running each of plaintiff's member organizations nor constitutes an activity which would normally be performed by the member organizations.

Although plaintiff professes that its services are "crucial to the ability of its members to perform their ... charitable missions," plaintiff admits that only "in *extreme instances* [will] the inability to secure insurance ... completely prevent [plaintiff's member] organizations from operating." Plf's Br. filed Feb. 22, 1994, at 7–8, 12 (citations omitted). To further support its position, plaintiff provided newspaper articles indicating that nonprofit organizations have experi-

enced losses of coverages or extreme rate increases. In a letter to the IRS dated January 23, 1992, plaintiff cited a national survey of charitable organization administrators, which found that 14 percent of the responding organizations eliminated programs due to insurance availability and prices. Another national survey illustrated that 79 percent of the responding organizations "had been hurt because they could not obtain adequate insurance." (Footnote omitted.) The court acknowledges the survey results, but finds that the overall facts in the record indicate that plaintiff's activities are not necessary and indispensable to the daily operations of plaintiff's members. Moreover, plaintiff is distinct from those involved in *Hospital Bureau, Northern California* and *Council for Bibliographic,* because it is comprised of 487 unrelated charitable entities, whereas the other cases involved related exempt organizations—hospitals and libraries, respectively.

Accordingly, based on the administrative record, the court finds that plaintiff has not sustained its burden of proof and that the IRS properly determined that plaintiff failed the operational test under I.R.C. § 501(c)(3) because of the existence of a substantial nonexempt, commercial purpose.

3. *Organizations providing commercial-type insurance as that term is defined in I.R.C. § 501(m)(3)(A)*

█ Even assuming that plaintiff qualifies as an organization described in I.R.C. § 501(c)(3), plaintiff, serving as a group self-insurance risk pool, must demonstrate that I.R.C. § 501(m)(1) does not preclude its exempt status. Section 501(m)(1) specifically provides that an organization described in section 501(c)(3) is exempt under I.R.C. § 501(a) "only if no substantial part of its activities consists of providing commercial-type insurance." Section 501(m)(3)(A) stipulates that for purposes of section 501(m), the term "commercial-type insurance" shall not include "insurance provided at substantially below cost to a class of charitable recipients." This provision forms the basis of the parties' dispute on point. Specifically, plaintiff and defendant disagree as to what qualifies as "substantially below cost" and what amounts

are to be employed in calculating whether plaintiff meets the "substantially below cost" threshold.

Both parties acknowledge the lack of authority concerning the meaning of the phrase "substantially below cost." Although the statute does not define the term, both the House Ways and Means and Joint Committee on Taxation Reports addressing section 501(m) refer to Rev.Rul. 71–529, 1971–2 C.B. 234, as "relating to the meaning of substantially below cost." H.R.Rep. No. 426, 99th Cong., 1st Sess. 665 (1985) (hereinafter "H.R. No. 426"); Staff of Jnt. Comm. on Taxation, 99th Cong., 1st Sess., *General Explanation of the Tax Reform Act of 1986* at 585 (Jnt.Comm.Print 1987) (same) (hereinafter "*General Explanation of the Tax Reform Act of 1986* "). Rev.Rul. 71–529 stipulates that where a taxpayer provides a subsidy of 85 percent, *i.e.,* members pay 15 percent of an organization's total costs, the taxpayer qualifies as tax-exempt under I.R.C. § 501(c)(3).

Plaintiff argues that the citation to Rev. Rul. 71–529 should not control the court's disposition of the "substantially below cost" analysis, because the Revenue Ruling is cited only as an example of what constitutes the provision of services at "substantially below cost." *See* H.R. No. 426 at 665 (citing "see e.g., Rev.Rul. 71–529 ... relating to the meaning of substantially below cost"); *General Explanation of the Tax Reform Act of 1986* at 585 (same). Plaintiff further notes that the IRS acknowledged that the standard set forth in Rev.Rul. 71–529 should not be adopted as a bright-line rule for determining what qualifies as substantially below cost. *See* G.C.M. 37,257 (Sept. 15, 1977). Plaintiff relies heavily on the IRS' statement in a footnote to G.C.M. 37,257 that "[a]lthough we are not prepared to suggest another percentage, we think that something significantly in excess of 15 percent [of costs] would be acceptable."

In contending that plaintiff does not satisfy the "substantially below cost" standard, defendant relies principally on the recent Tax Court decision in *Paratransit* and Rev.Rul. 71–529. Rather than seeking adoption of the 85–percent subsidy, defendant asks the court to examine *Paratransit* and look to the Reve-

nue Ruling for guidance as to what constitutes "substantially below cost."

The Tax Court in *Paratransit* addressed the issue of whether an organization which provided automobile insurance to a group of exempt organizations under section 501(c)(3) qualified under the section 501(m)(3)(A) exception to the definition of "commercial-type insurance." The corporation in *Paratransit*, like plaintiff, was organized under section 5005.1 of the California Corporations Code as a group self-insurance pool. The characteristics of the organization mimic many of the features of plaintiff's organization. For example, the organization offered automobile insurance, determined member contributions according to the level of risk, and provided reinsurance for certain claims.

In analyzing whether the taxpayer in *Paratransit* satisfied the "substantially below cost" threshold, the court relied heavily upon Rev.Rul. 71–529 given that the ruling constituted the only guidance provided by Congress for interpreting section 501(m)(3)(A). The ruling involved an organization formed to aid entities exempt under I.R.C. § 501(c)(3) to manage their investment funds in an effective and efficient manner. Each member contributed capital for investment and such funds were invested according to the advice of an independent investment officer. The IRS found that the organization provided investment services at "substantially below cost" because the member organizations paid *"only a nominal fee."* Rev.Rul. 71–529 (emphasis added). The fees assessed the member organizations constituted *"less than fifteen percent* of the total costs of operation," *i.e.,* an 85 percent subsidy, and the majority of the operating expenses were paid from grants by charitable organizations. *Id.*

Employing this standard, the Tax Court held that an arrangement whereby an organization's members, for the taxable years 1988–90, contributed 60.43, 79.90, and 83.96 percent, respectively, of the total costs of providing insurance "comes nowhere near the mark" for purposes of qualifying under

I.R.C. § 501(m)(3)(A). *Paratransit,* slip. op. at 20. The court derived these numbers by comparing the total amount of member revenues with petitioner's total costs or expenditures. Both plaintiff and defendant agree with this general methodology. The parties, however, disagree as to the components of "total costs."

██ Plaintiff argues that "only those items of operational income and expense not attributable to the risk pool itself" should be considered in the calculation of total cost. Plf's Br. filed June 1, 1994, at 20. Under this theory plaintiff maintains that it provides a 57–percent subsidy, thereby requiring members to pay only 43 percent of operational costs. The taxpayer in *Paratransit* made an identical argument, stating that in determining "substantially below cost," the court should examine only its "administrative operating costs," as opposed to its total expenditures, which included costs related to claim payments and reserve accounts. Slip. op. at 21. The Tax Court's conclusion that such a proposition of considering only operational expenses "flies in the face of common sense," *id.,* is persuasive. In discussing costs, Rev. Rul. 71–529 specifically states that the fees charged member organizations represent "less than fifteen percent of the *total costs of operation."* (Emphasis added.) This court cannot define plaintiff's total costs of operation to exclude the costs related to the provision of insurance, especially when plaintiff's raison d'etre is to provide insurance to non-profit organizations. The 57–percent subsidy figure advanced by plaintiff is rejected given it does not properly reflect total costs.

Even accounting for the costs associated with the provision of insurance, plaintiff maintains that it still provides insurance substantially below cost. Specifically, plaintiff asserts that from 1988–92, it provided "an aggregate charitable subsidy of approximately 35 percent" to its member organizations, thereby requiring members to pay only 65 percent of the total costs of plaintiff's operations.[9] Plf's Br. filed June 1, 1994, at 24.

---

9. In deriving this subsidy figure, plaintiff included the $1.3 million in foundation loans in calculating its total costs. The parties vigorously dispute the validity of this inclusion. Plaintiff maintains that the $1.3 million in foundation loans should be considered, in substance, as contribu-

According to plaintiff, such a subsidy satisfies the intendment of the section 501(m)(3)(A) exception.[10] The Tax Court held that a 35–percent subsidy does not fall within the realm of the exception. Providing insurance to members at approximately a 40–percent subsidy, where members pay 60 percent of costs "comes nowhere near the mark." *Paratransit*, slip. op. at 20. Thus, even including the disputed foundation loans in total costs and examining the costs on an aggregate basis as plaintiff suggests, plaintiff's numbers do not suffice.

This result is consistent with Rev.Rul. 71–529, which discussed the "substantially below cost" standard in evaluating whether an organization qualified as exempt under I.R.C. § 501(c)(3). The ruling illustrates that prior to the existence of I.R.C. § 501(m), incorporated into the Tax Code as a result of the 1986 Tax Amendments, the IRS performed an identical cost/below cost analysis in determining whether an organization qualified as exempt under section 501(c)(3). Arguably, the policy and analysis governing exemptions granted under I.R.C. § 501(c)(3) bear on the section 501(m)(3)(A) analysis.

In examining the "cost/below cost" analysis, the IRS in G.C.M. 38,877 (July 16, 1982), noted that the "provision of goods and services to other organizations described in section 501(c)(3) may be considered an activity

similar to those carried on *by a grant-making charity* .... [Such] activity will be considered to be conducted in a charitable manner only if the price charged is *substantially below cost*." G.C.M. 38,877 (emphasis added; citation omitted). The IRS further defined "substantially below cost" by stating "that the activities of the organization are clearly distinguishable from those of its commercial counterparts *by manifestation of donative intent.*" *Id.* (emphasis added); *see* Rev.Rul. 71–529 (emphasizing that member organizations paid only a *"nominal fee"* and that *"most* of the operating expenses" were paid by grants from charitable entities)" (emphasis added). Providing members a 35–percent subsidy in obtaining insurance benefits, thereby requiring them to pay 65 percent of the costs of plaintiff's operation, does not qualify under the rubric of "donative intent."

Finally, the result in *Paratransit* is supported by legislative history. In enacting I.R.C. § 501(m), Congress particularly was concerned that non-profit organizations would take advantage of their tax-exempt status to compete unfairly with commercial, for-profit insurance companies. The Joint Committee on Taxation Report summarizes these concerns, as follows:

> Congress was concerned that exempt charitable and social welfare organizations that engage in insurance activities are engaged

tions or grants, not debt. To support its position, plaintiff cites *Segel v. Commissioner*, 89 T.C. 816, 828–29, 1987 WL 49800 (1987), for the proposition that if a taxpayer receives funds and could not have obtained such funds on similar terms from a commercial lender then the funds provided should be considered a capital contribution for federal tax purposes, as opposed to a loan. Because no commercial lender would have loaned plaintiff $1.3 million, plaintiff asserts that the non-commercial nature of the loans dictates that they be considered as grants, not loans.

*Segel* involved the narrow issue of whether to address distributions from a company to its shareholders as debt or equity in light of previous payments made by the shareholders to the corporation. In characterizing the distributions as capital contributions, the court relied heavily on the absence of any written agreement between the company and the shareholders evidencing the form of payments. In contrast, plaintiff and the foundations executed specific loan agreements governing the terms of repayment. Even if the court adopts plaintiff's ap-

proach of including the $1.3 million in total costs and evaluating the below cost issue on an aggregate as opposed to annual basis, plaintiff's numbers, as explained below, cannot be characterized as "substantially below cost."

10. Plaintiff supports the propriety of the 35–percent subsidy by relying on Rev.Rul. 61–72, 1961–1 C.B. 188, which according to plaintiff indicates that a 25–percent subsidy qualifies under the rubric "substantially below cost." Although plaintiff admits that the ruling "does not directly state that the [old age] home provided its services at 25 percent below its own cost," plaintiff argues that one can easily calculate this figure. Plf's Br. filed June 1, 1994, at 30–31. The court, however, cannot discern how plaintiff derived this number, especially given that the ruling contained only one numerical reference of "35," not "25." Even assuming that plaintiff properly derived the 25–percent subsidy figure, the court finds that plaintiff's suggested subsidy of 35 percent does not fall within the parameters of what Congress intended to qualify as "substantially below cost."

in an activity whose nature and scope is inherently commercial rather than charitable; hence, tax-exempt status is inappropriate. Congress believed that the tax-exempt status of organizations engaged in insurance activities provided an unfair competitive advantage to these organizations....

*General Explanation of the Tax Reform Act of 1986* at 584. This report indicates that Congress enacted section 501(m) to restrict, not enlarge, the scope of organizations that qualify for tax-exempt status under section 501(c)(3). *Paratransit,* slip. op. at 15. The record reflects that plaintiff directly competes with commercial firms during the soft period of the insurance cycle, a period which has existed since plaintiff's inception. Providing exempt status to organizations such as plaintiff or the taxpayer in *Paratransit* would contravene congressional intent. The Tax Court in *Florida Hospital* so acknowledged, noting that Congress specifically sought to deny exempt status to group self-insurance pools to ensure that such inherently commercial "organizations would not enjoy an unfair competitive advantage...." No. 2966–68–93X, 103 T.C. at 160, slip. op. at 33 (Aug. 4, 1994). Although this court is not prepared to draw a bright line demarcating what constitutes "substantially below cost," plaintiff has not sustained its burden in that the aggregate 35 percent subsidy from 1988–92 does not fall within the boundaries of the section 501(m)(3)(A) exception.

Plaintiff attempts to distinguish *Paratransit* by arguing that the Tax Court's decision hinged on the fact that "in-kind expenses" comprised a significant portion of the taxpayer's charitable subsidy, whereas its charitable subsidy consists "exclusively of 'hard' dollar costs." Plf's Br. filed July 5, 1994, at 2. The fact the Tax Court included the value of in-kind services in determining the taxpayer's overall costs benefits plaintiff, because such a computation resulted in higher subsidy estimates for the taxpayer in *Paratransit.* In the alternative, plaintiff distinguishes the case based on the substantial amount of the foundation loans, which provided plaintiff the ability to significantly subsidize its operations. Plaintiff argues that without the loans, it would have been required to ask for an additional $1.3 million from its members. The court acknowledges that the foundation loans enabled plaintiff to obtain the required reserves set forth by the insurance industry. In using plaintiff's figures, the court has considered these loans. Moreover, the existence of the loans standing alone does not warrant a finding that plaintiff provided its services substantially below cost, because, as the parties agree, the proper analysis under I.R.C. § 501(m)(3)(A) requires an examination of total revenues as compared with total costs. Finally, plaintiff urges the court not to follow this Tax Court precedent.

Even examining plaintiff's annual, as opposed to aggregate, figures for the tax period at issue, plaintiff's numbers miss the mark under the standard adopted by the authorities discussed above. Using plaintiff's figures, defendant derived annual percentage subsidies for 1990 through 1992, whereby plaintiff provided a subsidy of 53, 35, and 22 percent, respectively, from 1990 through 1992, *i.e.,* members contributed 47, 65, and 78 percent of costs, respectively.[11] Although plaintiff commenced operations in November 1989, the subsidy for that year based on only two months of data is not properly reflective of plaintiff's overall costs and therefore is not considered.

Plaintiff's members have contributed as much as 78 percent of the total costs of operation most recently in 1992 and as little

11. The only significant difference between plaintiff and defendant's figures is that plaintiff included the $1.3 million in foundation loans and $31,055.00 in equipment donations in the cost calculation only for 1989. Acknowledging that both the $1.3 million in foundation loans and donated equipment existed at the close of 1992, defendant applied the donations and loans ratably over the period from 1989–92. *See* Def's Reply to Plf's Response to Def's Prop. Findings of Fact No. 19, filed July 21, 1994.

While including the foundation loans in its calculations, defendant vigorously argued against inclusion of such figures on the ground that these funds are not grants or charitable donations, but loans which must be repaid according to the terms of the loan agreements. However, even including the foundation loans ratably over the period at issue, plaintiff's figures do not qualify under the meaning of "substantially below cost."

as 47 percent in 1990. Contributing 47 percent of costs, however, does not satisfy the policy underlying the "substantially below cost" analysis. Such a figure is neither a "nominal fee," Rev.Rul. 71–529, nor does it manifest donative intent. G.C.M. 38,877; *see Paratransit,* slip. op. at 20 (holding that where member organizations bear approximately 60 percent of the costs of operation, such figure "comes nowhere near the mark"). At argument plaintiff asserted that the "nominal fee" language in Rev.Rul. 71–529 should not control the disposition of the case. Although the court does not interpret the provision of services at "substantially below cost" to mean that members contribute only a "nominal" amount, the court does find that the fees paid by members of organizations such as plaintiff's should, at a minimum, be "insubstantial." Plaintiff's fees do not meet this threshold.

Even employing plaintiff's figures, which included the disputed foundation loans, plaintiff does not fall within the intendment of section 501(m)(3)(A) and therefore cannot qualify as exempt under I.R.C. § 501(a). As defendant properly notes, "wherever the dividing line [exists] between [providing insurance] 'substantially below cost' and *not* [providing insurance] 'substantially below cost,' ... the minimal subsidies involved in this case fall squarely and easily on the wrong side of ... [the] line...." Def's Br. filed July 21, 1994, at 7–8 (emphasis in original). In light of this conclusion, the court need not consider the IRS' determination that plaintiff qualifies as a feeder organization within the meaning of I.R.C. § 502.[12]

### CONCLUSION

Accordingly, based on the foregoing, the IRS properly determined that plaintiff does not qualify for tax-exempt status under I.R.C. § 501(c)(3). The Clerk of the Court shall enter judgment dismissing the complaint.

12. In the February 24, 1993 adverse determination letter, the IRS noted that plaintiff was precluded from qualifying as exempt under I.R.C. § 501 because it was a feeder organization as defined by section 502. In briefing arguments, defendant did not raise this issue. Defendant,

**IT IS SO ORDERED.**

No costs.

however, in responding to plaintiff's proposed findings of fact, did refute plaintiff's assertion that it was not a feeder. *See* Def's Response to Plf's Prop. Findings of Fact No. 4, filed Apr. 25, 1994.